For the foregoing reasons, the judgment of the BAP is AFFIRMED.

---

**Kui Rong MA, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–70956.

United States Court of Appeals, Ninth Circuit.

Argued Nov. 7, 2003.

Submitted March 8, 2004.

Filed March 15, 2004.

---

Jisheng Li, Esq., Law Office of Jisheng Li, Honolulu, HI, for the petitioner.

M. Jocelyn Lopez Wright, Senior Litigation Counsel, Office of Immigration Litigation Civil Division, U.S. Department of Justice, Washington, DC, for the respondent.

Before BROWNING, REINHARDT, and THOMAS, Circuit Judges.

REINHARDT, Circuit Judge.

Kui Rong Ma, a native and citizen of the People's Republic of China ("China"), petitions for review of the Board of Immigration Appeals' ("BIA") order denying his motion to reconsider or reopen its decision to deny him asylum. In denying the motion to reconsider, the BIA determined that only a spouse in a marriage "legally" registered with the Chinese government can establish past persecution and qualify as a refugee on the basis of his wife's forced abortion or sterilization. The BIA's decision in this regard limited *In Re Matter of C–Y–Z*, 21 I. & N. Dec. 915 (BIA 1997), which held that past persecution of one spouse can be established by coerced abortion or sterilization of the other spouse. *Id.* at 918.

On appeal, Ma asserts that the BIA's determination, that an individual in a marriage that cannot legally be registered in China is not a spouse, is contrary to the relatively recent Congressional amendment granting asylum status to victims of China's oppressive population control poli-

cy. *See* INA § 101(a)(42)(B), 8 U.S.C. § 1101(a)(42)(B).[1] Ma contends that the marriage restriction is an integral part of the policy that Congress targeted and that in China a pregnancy occurring during a marriage that is not registered is subject to abortion. He maintains that the BIA's decision is based on an erroneous assumption, namely that there is no connection between the inability to obtain registration from the Chinese government for a "traditional" marriage when it is "underage" and China's coercive family planning policies. We agree.[2]

I

When Ma was nineteen, he fell in love with Lei Chiu Ma ("Chiu"), who was twenty-one. The government of China prohibited them from entering into a legally recognized marriage until Ma turned twenty-two.[3] But the couple did not want to wait to get married. So, Ma and Chiu were wed in a "traditional" Chinese ceremony in their village, on February 5, 1998. Two months later, Chiu became pregnant. Because Chinese population control policies prohibited Chiu from becoming pregnant until she entered into a legally registered marriage, and because pregnancies occurring outside of such a marriage were subject to termination by forced abortion, she and Ma worried that government officials would abort her pregnancy. To ensure that her pregnancy would not be noticed by local birth control officials, Chiu hid in her aunt's house located in a village some twenty minutes from her own.

Ma wanted to live with his wife without fear of reprisal, so he attempted to register his marriage with local authorities. The officials denied his request for registration, stating that he had not reached the legal age for marriage.

Ma's attempt to register his marriage served to notify local birth control officials that the couple had violated the population control laws by their underage marriage; unfortunately, those officials also learned that Chiu had become pregnant. In October of 1998, five local officials came to Ma's house and demanded that he produce his wife for a physical examination and for forced abortion procedures. When Ma refused to tell the officials where Chiu was hiding, they seized Ma's 63–year–old father, threatening that he would be placed in detention until Chiu presented herself for an abortion. Ma tried to stop the officials from taking his father. His efforts failed. The officials beat Ma and took his father into custody.

Ma did not tell Chiu about his father's detention, because he did not want her to surrender herself for a forced abortion. However, the family planning officials deliberately spread the news that Ma's fa-

---

**1.** Section 101(a)(42)(B) provides in relevant part:

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal,

> or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

**2.** We set forth the facts as they were testified to by Ma and found to be true by the immigration judge. The INS appealed the immigration judge's credibility findings but the BIA found it unnecessary to reach the issue.

**3.** The legal age for women to marry in Ma's village is twenty. Chiu met this requirement because she was twenty-one at the time of the couple's traditional marriage ceremony.

ther had been placed in prison, presumably in hopes that word would reach Chiu. When she finally learned of her father-in-law's detention and heard that he might be tortured on her account, she went to the Family Planning Office to plead for his release. She later told Ma that she thought she might be able to convince the officials to let her have their child, because the couple had no other children. She was wrong. Officials detained her and forcibly aborted the pregnancy, which was in its third trimester. After the authorities released Chiu, they fined the couple ·5,000 RMB for the "early" pregnancy and marriage.[4]

In the days after her abortion, Chiu became ill, both mentally and physically. She and Ma decided that they should not stay in China. Chiu encouraged Ma to leave for America first and then to send for her as soon as possible. At the end of March, after arrangements had been made and funds for the trip collected, Ma left China, smuggled in the hull of a boat. His plans to bring his wife to the United States and reunite his family were quickly frustrated, however.

Upon his arrival in Guam, Ma was intercepted by immigration authorities and placed in an immigration detention center, where he remained for a number of years. Shortly after he was detained, the Immigration and Naturalization Service ("INS") commenced removal proceedings. Ma applied for relief in the form of asylum, withholding of removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and withholding of removal pursuant to Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punish-

ment ("Convention Against Torture"), opened for signature Feb. 4, 1985, S. Treaty Doc. No. 100–20, at 20 (1988). He claimed that he and his wife had been persecuted by the Chinese government based on their opposition to China's population control policies and sought relief under section 101(a)(42)(B). Specifically, he alleged persecution on the basis of his wife's forced abortion and the refusal to permit his underage marriage. Ma submitted supporting documentation with his application, including a receipt for payment of the 5,000 RMB fine, a certificate of proof regarding the forced abortion, and a picture of himself and his "common law wife." The Immigration Judge ("IJ") found Ma credible and granted his application for asylum. The IJ determined that Ma's "traditional" marriage to Chiu qualified him as her spouse and allowed Ma to base his asylum claim on his wife's forced abortion. She considered the BIA's prior decisions on the subject, as well as the language of section 101(a)(42)(B), and concluded that refugee status was:

> not limited to individuals who actually undergo a[n] involuntary abortion or sterilization but appears to encompass those who would offer resistance to coercive population control programs. In a situation where a marriage cannot be registered because foreign law precludes marriage by men under the age of [twenty-two], while no visa petition for example, could be granted on a spouse [ ] petition, there does not appear to be a logical or statutory bas[i]s to rule that a common law husband cannot meet his burden o[f] proof when his common law wife has had a forced abortion.

---

**4.** The original documentation for Ma's payment of this fee contains a check in the early marriage box, as well as the early pregnancy box, indicating that the fine was imposed for both reasons. However, the translated version shows only that it was for the unlawful pregnancy.

The INS filed a notice of appeal with the BIA contending that only a "legally recognized" marriage qualified an individual as a "spouse" for the purpose of requesting asylum.[5] By a two to one vote, the members of the BIA majority revoked Ma's asylum status, stating that in order to invoke his wife's persecution to establish asylum, Ma needed to provide proof of a "legal[ ]" marriage. Without such proof, Ma could not be "the spouse of the person who was allegedly forced to have an abortion." In response to Ma's assertion that his inability to obtain "legal" registration was a result of a law promulgated as part of China's coercive population control plan, the BIA stated that it found no link in the record between Ma's inability to establish a legal marriage and the Chinese policy. In dissent, Board Member Schmidt wrote:

> In this case there is absolutely no doubt about the relationship between the respondent and his "common law spouse." Whether or not the persecuting country, China, would decline to recognize the marriage on technical grounds, because the respondent was under the age of [twenty-two], has little, if anything, to do with this asylum application.

Ma filed a motion to reconsider. He asserted that the decision was erroneous and submitted additional evidence to support his asylum claim. During his lengthy detention, Ma had reached the legal age to marry in China. Shortly after turning twenty-two, Ma requested a certificate from the Chinese government to provide the BIA with proof of the validity of his marriage. Ma submitted with his petition the certificate he obtained from the Chinese government dated March 2002, which confirmed that Ma and his wife Chiu had "a wedding ceremony according to the rural customs" and stated that the Chinese government had recently issued a certificate recognizing his marriage as a "de facto" marriage. Ma also introduced a report from the Chinese Communist Party establishing that the prohibitions on underage marriage were part of China's population control policy; in submitting this report, he hoped to provide additional evidence to the BIA to prove that it had made an error when it found that his inability to register his traditional marriage was not "directly attributable" to the enforcement of this policy.

The BIA construed Ma's motion as one to reconsider and reopen the prior decision and then denied it. In denying the request for reconsideration, the BIA held that Ma had not "demonstrated a legal or factual error" in its prior decision, and that "as it previously stated on appeal,[it] decline[d] to extend [*Matter of C–Y–Z* ] protection to legally unmarried partners." Ma appealed.

II

On review, we consider only the BIA's order denying Ma's motion to reconsider and reopen.[6] However, to the extent that the BIA in denying the motion adopted the underlying reasoning and holding of its prior opinion, we look to that underlying opinion. *See Mejia v. Ashcroft,* 298 F.3d 873, 876–77 (9th Cir.2002) (holding that where the denial of reconsideration relies

---

**5.** Ma waived his right to appeal from the IJ's denial of withholding of removal and protection under the Convention Against Torture because he failed to raise these issues in the reply brief to the government's appeal.

**6.** We agree with the government that we do not have jurisdiction over the BIA's March

13, 2002, order ("March 13th Order") denying the original appeal because Ma filed his petition more than thirty days from the date of that order. INA § 242(b)(1), 8 U.S.C. § 1252(b)(1); *Singh v. INS,* 315 F.3d 1186, 1188 (9th Cir.2003).

upon the reasoning in the previous order, then it is appropriate to examine that prior opinion).[7]

### a. *Waiver*

■ As a preliminary matter, the government contends that Ma has waived his argument that the BIA erred in restricting the definition of "spouse" to individuals in "legally" registered marriages because he did not present it under a heading explicitly challenging the BIA's denial of the motion to reconsider, but rather under the portion of his brief discussing the March 13th Order. We reject this contention for two reasons.

First, because the BIA's denial of reconsideration explicitly reaffirmed the conclusion and reasoning of the underlying opinion, preferring to adopt it rather than offer a different analysis, it was permissible for Ma to refute the arguments made in that opinion in order to explain why the BIA should be reversed. *See Mejia,* 298 F.3d at 876–77. Second, in its brief the government provided a full response to Ma's contentions, and we do not see how it could have suffered prejudice, as its principal complaint is that Ma failed to raise these contentions under the appropriate heading in his brief or to discuss specific sections of the motion to reconsider when advancing those contentions. *See United States v. Ullah,* 976 F.2d 509, 514 (9th Cir.1992) (court may review an issue if the failure to raise it properly did not prejudice the opposing party). Accordingly, we conclude that the INS's waiver argument lacks merit.

### b. *Standards of Review*

■ A petitioner's motion to reconsider must identify a legal or factual error in the BIA's prior decision. *See* 8 C.F.R. § 1003.2(b)(1) (2003) (stating that the motion "shall state the reasons for the motion by specifying the errors of fact or law in the prior Board decision and shall be supported by pertinent authority"); *see also Matter of Cerna,* 20 I. & N. Dec. 399, 402 (BIA 1991) (stating that a motion to reconsider "questions the Board's decision for alleged errors in appraising the facts and the law"; when the BIA reconsiders a decision, it considers the case as though a decision had never been entered). Where, as here, the denial of the motion to reconsider turns on the BIA's construction of INA provisions, we review the BIA's construction de novo, subject to established principles of deference. *Kamalthas v. INS,* 251 F.3d 1279, 1281–82 (9th Cir. 2001). In such circumstances, "deference is owed to the BIA's reasonable interpretations of such provisions, so long as they do not contravene other indications of congressional intent." *Id.* at 1282 (citing *INS v. Aguirre-Aguirre,* 526 U.S. 415, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Further, statutory interpretations which would produce absurd results are to be avoided. *United States v. Wilson,* 503 U.S. 329, 334, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992).

### c. *Merits*

■ The BIA determined that, although a husband whose marriage is registered with the state may obtain refugee status on the basis of his wife's sterilization or abortion, a husband whose marriage is not so registered, because China's coercive population control policy prohibits registration, may not. Ma contends that this

---

7. Because we conclude that the BIA abused its discretion in denying the motion to reconsider, we do not reach the motion to reopen.

determination contravenes the statute and we agree.

The statute grants asylum to individuals who have been subjected to a forced abortion or sterilization procedure pursuant to Chinese population control policies. INA § 101(a)(42)(B). The BIA and the courts have uniformly applied the statute's protections to husbands whose wives have undergone abortions or sterilization procedures, as well as to the wives themselves. *He v. Ashcroft*, 328 F.3d 593, 603–04 (9th Cir.2003) (holding that where the petitioner's wife underwent a sterilization procedure, the petitioner was automatically eligible for asylum); *Qiu v. Ashcroft*, 329 F.3d 140, 144–45 (2d Cir.2003) (recognizing that a petitioner may assert a claim of persecution on the basis of his wife's forced sterilization); *Matter of C–Y–Z*, 21 I. & N. Dec. at 918 (holding that where a petitioner's wife undergoes either an abortion or sterilization procedure, he is eligible for asylum).[8] The evident purpose of these decisions is to fulfill Congress's goal in passing the amendments—to provide relief for "couples" persecuted on account of an "unauthorized" pregnancy and to keep families together. *See* H.R.Rep. No. 104–469(I), at 174 (1996).

The question presented here is whether husbands, whose marriages are denied recognition by virtue of the population control program that Congress has condemned, may be deprived of eligibility for asylum on the basis of that denial. In other words, we must determine whether husbands may be denied eligibility because China refuses to grant official recognition to marriages that, in its view, would lead to an excessive number of children. We hold that eligibility for asylum may not be denied on that basis. The BIA's refusal to grant asylum to an individual who cannot register his marriage with the Chinese government on account of a law promulgated as part of its coercive population control policy, a policy deemed by Congress to be oppressive and persecutory, contravenes the statute and leads to absurd and wholly unacceptable results. Accordingly, we need not defer to the BIA's decision. *See Kamalthas*, 251 F.3d at 1282 (the court need not defer to the BIA's interpretation of a statutory provision where that interpretation contravenes the statute); *Wilson*, 503 U.S. at 334, 112 S.Ct. 1351 (statutory interpretations that lead to absurd results are to be avoided).

### i. *Congressional Intent*

The record in this case conclusively shows, and this Circuit has already held, that the prohibition against underage marriages is "an integral part" of China's coercive population control program. *See Li v. Ashcroft*, 356 F.3d 1153, 1160 n. 5 (9th Cir.2004)(en banc); *see also* Circular Notice on Obligations of Departments Directly under the Municipality in Implementing Fujian Province Planned Birth Regulations (stating that the policy against early marriages should be strictly enforced in order to prevent early births); Fuzhou City's Enforcement of the 'Fujian Province Family Planning Regulations' (stating that "[i]t is strictly forbidden to get married and give birth underage"); 1999 China Country Report (stating that unmarried women are prohibited from having chil-

---

8. We note that in *He*, *Qiu*, and *Matter of C–Y–Z* the male petitioner entered into a marriage deemed illegal by the Chinese government because one or both of the spouses were underage. In none of these cases, however, did the INS or the BIA deny relief on the ground that the petitioner failed to obtain a "registra-

tion" certificate from the Chinese government, nor did the INS or the BIA mention the failure to "register" as an issue to be considered. The failure of the INS to invoke this purported restriction on asylum relief prior to the present case further calls into question its legitimacy.

dren); Family Planning Office, Changle Receipt for Out–Of–Plan Birth Fee (fine receipt, which among other things, includes a box to fine individuals for early marriages and births); Hearing on China's Planned Birth Policy Before the House International Relations Comm., Subcomm. on Int'l Operations and Human Rights, 105th Cong. (1998) (statement of Zhou Shiu Yon, Victim) (witness stating that because she could not obtain a marriage certificate or a birth permit on account of her early marriage, her pregnancy was illegal and officials sought her out to perform abortion procedures). The record also establishes that women are prohibited from having children prior to entering into a marriage sanctioned under the Chinese population control policy and that the policy against underage marriages was designed to reduce the period of time during which couples could legally reproduce. *Id.*

Here, because Ma and Chiu could not legally register their marriage until Ma turned twenty-two, the couple's first pregnancy was considered an "early" illegal pregnancy, which warranted forced abortion. In other words, Chiu's pregnancy was terminated solely because Ma had not turned twenty-two, (even though Chiu herself had reached the legal age for marriage).[9] Congress's amendments to the immigration statute are clearly intended to provide protection to individuals who suf-

fer persecution, in the form of forced abortion, as a result of their violation of the population control program. Because the early marriage prohibition is inextricably linked to the restrictions on childbirth, the BIA's decision to limit asylum eligibility so as to exclude husbands who marry their spouses prior to the authorized age established in the program contravenes the purpose and policies of the statutory amendment.

In a misguided attempt to provide some statutory support for the BIA's decision, the government asserts that if a husband in a non-registered marriage is provided relief, it will create an absurd result, namely that his spouse, the "persecuted female" will be unable to benefit from her husband's grant of asylum pursuant to the derivative status provision of INA § 208(b)(3).[10] 8 U.S.C. § 1158(b)(3); *see also* 8 C.F.R. § 208.21 (2002). The government's argument is simply wrong. That the persecuted female cannot obtain derivative status under section 208(b)(3) is entirely without meaning, because, under the plain language of section 101(a)(42), she is eligible for relief as a refugee in her own right. As such, she could not benefit from section 208(b)(3) derivative status even if her marriage had been recognized by the Chinese government; section 208(b)(3) status is only available to individuals who are not "otherwise eligible for

9. The government's position on appeal—that the underage marriage prohibition was not related to the forced abortion—is further undermined by the position it took during Ma's hearing before the IJ. At that hearing, during its questioning of Ma, government counsel emphasized that because Ma and his wife could not register their marriage, the couple was prohibited from having children:

> Mary Lee Fong, INS: Since you and your wife didn't have a registered marriage, did you realize that if you and your wife had a baby that it was not permitted?

> Ma: I do know that I was not permitted to have baby.

10. Section 1158(b)(3) provides in relevant part:

> A spouse or child (as defined in section 1101(b)(1)(A), (B), (C), (D), or (E) of this title) of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.

> *Id.*

asylum under this section." *Id.* In other words, Ma's common law wife cannot benefit from the derivative status protection of section 208(b)(3) because she, herself, satisfies the refugee criteria of section 101(a)(42)(B) based on her forced abortion. *See He,* 328 F.3d at 604 (stating that a person who has been forced to abort a pregnancy is automatically classified as a refugee, and is therefore automatically eligible for asylum). The "absurd" consequence that the government fears if we hold in favor of Ma—a persecuted wife presumably unable to join her asylee common law husband in this country—is a pure figment of the government's imagination: the persecuted female is automatically deemed a refugee upon a finding that her testimony regarding the forced abortion or sterilization is credible.

Only by adopting the BIA's rule restricting relief to legally registered spouses would we create the harsh and arbitrary result that the government decries in its brief, namely breaking apart a family. If Chiu, Ma's wife, applied for asylum, she would be automatically eligible based on her forced abortion. Yet, under the BIA's rule, Ma's husband would not be eligible because under China's population control program their marriage was "underage" and could not be "legally registered." Application of the BIA's rule would result in the separation of a husband and wife, the break-up of a family, a result that is at odds not only with the provision at issue here, but also with significant parts of our overall immigration policy. *See, e.g., Kaho v. Ilchert,* 765 F.2d 877, 879 n. 1 (9th Cir.1985) (recognizing that one of the Act's basic objectives is to reunite families); *Lau v. Kiley,* 563 F.2d 543, 545 (2d Cir. 1977) (same); *Perales v. Casillas,* 903 F.2d 1043, 1051 (5th Cir.1990) (recognizing that one of Congress's reasons for enacting the visa preference provisions is family unification). We cannot construe the statute in the manner suggested by the BIA because, as the government correctly points out, we cannot adopt a construction that leads to absurd results—the break-up of the family unit. *Wilson,* 503 U.S. at 334, 112 S.Ct. 1351 (holding that courts should interpret statutes so as to preclude absurd results).

The government also contends that we must follow China's policy regarding the minimum age for marriage in determining whether to recognize Ma as Chiu's husband. While ordinarily we respect the marriage rules and regulations of foreign nations, including the establishment of a minimum age, *cf. Adams v. Howerton,* 673 F.2d 1036, 1038–39 (9th Cir.1982), here the entire purpose of Congress's amendment to the asylum statute is to give relief to victims of China's oppressive population control policy. As we have stated, because the prohibition on underage marriage is an integral part of that policy, it would contravene the fundamental purpose of the statute to deny asylum on the basis of that rule. Because the purpose of section 101(a)(42)(B) is to protect individuals, such as Ma, from persecution stemming from the program at issue here, it would contravene the statute to permit asylum decisions to be made in reliance on the legitimacy of the program, including its prohibition against underage marriages.

### d. *Conclusion*

*Accordingly, we hold that the protections of section* 101(a)(42)(B) *apply to husbands whose marriages would be legally recognized, but for China's coercive family planning policies, and not only to husbands whose marriages are recognized by Chinese authorities.*

We GRANT THE PETITION FOR REVIEW and REMAND for further proceedings consistent with this opinion.

PETITION GRANTED AND RE-
MANDED.