**Qin Li ZHENG, Petitioner**

v.

**Alberto R. GONZALES,\* Attorney General of the United States; Bureau of Citizenship and Immigration Services, Respondents (\*Substituted pursuant to Rule 34(c), Fed. R.App. P.).**

No. 04–1441.

United States Court of Appeals, Third Circuit.

Argued Dec. 6, 2004.

Decided Aug. 31, 2005.

Theodore N. Cox, Joshua E. Bardavid, (Argued), New York, NY, for Petitioner.

Peter D. Keisler, Assistant Attorney General, Civil Division, Donald E. Keener, Deputy Director, John J. Andre, Senior Litigation Counsel, Linda S. Wernery, Alison M. Igoe, (Argued), William C. Peachey, Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., for Respondent.

Before AMBRO, and VAN ANTWERPEN, Circuit Judges SHADUR,* District Judge.

## OPINION

AMBRO, Circuit Judge.

Qin Li Zheng[1] seeks our review of an order of the Board of Immigration Appeals ("BIA") affirming, without opinion, the decision of the Immigration Judge ("IJ") denying asylum, withholding of removal, and relief under Article III of the United Nations Convention Against Torture ("CAT").[2] Because we conclude that the IJ erred by not considering whether Zheng has a well-founded fear of persecution if he returns to China, we grant Zheng's petition for review in part and remand for further proceedings.

## I. Factual Background and Procedural History

Zheng is a native and citizen of the People's Republic of China. In the course of the proceedings before the IJ that are the subject of his petition for review, Zheng admitted that, in February 1994, he submitted a false application for asylum with the former Immigration and Naturalization Service ("INS").[3] In that false application, Zheng claimed that following the events at Tiananmen Square in June 1989—at which time Zheng was a high school student—he joined a student associ-

---

* Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

1. Though the first name in China is the surname, we refer to petitioner as 'Zheng,' as the parties have done so in their briefs.

2. The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984,

1465 U.N.T.S. 85, implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105–277, § 2242, 112 Stat. 2681–761 (codified at 8 U.S.C. § 1231).

3. Effective March 1, 2003, the INS ceased to exist and its functions were transferred to the Department of Homeland Security ("DHS").

ation to support the democracy movement. He further stated that his name appeared on an "arrest paper" after he participated in a pro-democracy demonstration, causing him to leave China for the United States. Based on these allegations, Zheng sought asylum and other relief, and an INS officer preliminarily denied his asylum application. Evidently no further action was taken by the parties with respect to the 1994 application.

In April 2001, Zheng applied again for asylum and withholding of removal (and, for the first time, relief under the CAT), alleging he was persecuted on account of China's coercive "one-couple, one-child" family planning policy. His second application and accompanying testimony before the IJ recounted an entirely different set of events, and he admitted that the prior application was untruthful. According to the second application, Zheng was married in a traditional ceremony in China in January 1989. After the birth of the couple's first child, a girl, in October 1989, Chinese family planning officials warned the couple that they were prohibited from having another child for five years and threatened them with fines and forced abortion if they violated the prohibition. In March 1990, the Zhengs learned that Ms. Zheng was pregnant, and she went into hiding. Zheng fled China and arrived in the United States in April 1990. The Zhengs' second child, also a daughter, was born in December 1990.

Following the birth of their second daughter, Ms. Zheng and their older daughter went to live with Zheng's mother, while their younger daughter lived with neighbors. Eventually officials learned of the birth of the second daughter and issued a notice of sterilization. Ms. Zheng fled to the United States in September 1995. (As a result of proceedings against her, she too is subject to a final order of removal.) The Zhengs' two daughters later emigrated to the United States. Along with their daughters, the Zhengs also are the parents of two sons born in the United States.

In support of his claims, Zheng submitted an affidavit from John Shields Aird, Ph.D., a retired demographer from the United States Bureau of the Census specializing in demographic developments and population policy in China. His affidavit presents a detailed description of the coercive measures taken by Chinese family planning officials. Particularly relevant to Zheng's claims, the Aird affidavit assesses the situation Zheng would confront if he and his children return to China and rejects the assertion that family planning officials are unlikely to punish citizens returning to China with children born abroad. Specifically, Aird states:

> Chinese couples returning home with unauthorized children cannot expect to be exempt [from China's family-planning policy].... The reason why the Chinese family planning authorities attempt to enforce family planning rules on their nationals living abroad is that to ignore violations would tend to undermine the enforcement of the rules in China. The Chinese authorities cannot afford to let rumors get about that couples of child-bearing age can evade the one-child limit by leaving the country illegally, having unauthorized children in foreign-countries, and returning home without suffering the standard penalties.

According to Aird, the penalties for violating family planning strictures include forced abortion and sterilization.

Without addressing the Aird affidavit or otherwise inquiring into evidence concerning the treatment of Chinese citizens returning with children born abroad, the IJ denied Zheng's requested relief. That decision was based on an adverse credibility

finding, stemming in large measure from the false (by Zheng's own admission) asylum application in 1994. Zheng's petition for review of the BIA's decision affirming the IJ opinion is now before us.

## II. Jurisdiction and Standard of Review

Our jurisdiction arises under § 242(a)(1) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(a)(1). Where, as here, the BIA affirms the IJ's decision without opinion, "we review the IJ's opinion and scrutinize its reasoning." *Dia v. Ashcroft,* 353 F.3d 228, 245 (3d Cir.2003) (*en banc*). The IJ's findings must be upheld unless any reasonable adjudicator would be compelled to reach a contrary conclusion. *See* 8 U.S.C. § 1252(b)(4)(B). Because whether an alien has a "well-founded" fear of persecution is a finding of fact, our Court must sustain the IJ's determination if there is substantial evidence in the record to support it. *Gao v. Ashcroft,* 299 F.3d 266, 272 (3d Cir.2002).

## III. Asylum and Withholding of Removal

### A.

To be eligible for asylum, an applicant must be a "refugee" within the meaning of INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). A "refugee" is a person who is unable or unwilling to return to his country because of persecution or a well-founded fear of persecution on account of his race, religion, nationality, membership in a particular social group, or political opinion. *Id.* An asylum applicant bears the burden of proving statutory eligibility and that the application merits asylum as a matter of discretion. 8 C.F.R. § 208.13; *Balasubramanrim v. INS,* 143 F.3d 157, 161 (3d Cir.1998).

Resistance to China's one-child policy falls under political opinion persecution. 8 U.S.C. § 1101(a)(42). Though the BIA re-

jected the argument that China's one-child policy in and of itself is persecution or creates a well-founded fear of persecution, *In re Chang,* 20 I. & N. Dec. 38, 44 (B.I.A.1989), Congress, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), amended the definition of "refugee" to provide that

> a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42); *see also In re X–P–T,* 21 I. & N. Dec. 634, 636 (BIA 1996) (explaining that *Chang* was superseded by IIRIRA's changes to the law of asylum codified at 8 U.S.C. § 1101(a)(42)). To qualify for withholding of removal (which, unlike asylum, is not discretionary) the applicant must prove it is "more likely than not" that he will face persecution on account of one of the enumerated characteristics if returned to the country of removal. 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b).

### B.

Zheng's claim is stated succinctly in his application for asylum: "We cannot go back to China because we have four children. If we were sent back, either my wife or I will be forcibly sterilized by [the] Chinese government." Translated into the parlance of immigration law, Zheng con-

tends that he has a well-founded fear of future persecution—a contention that warranted independent consideration, notwithstanding the IJ's finding that past persecution had not been shown. *See, e.g., Lin v. Ashcroft,* 385 F.3d 748, 757 (7th Cir.2004) ("Even if [the applicant] fails to establish past persecution, the IJ must independently consider whether [the applicant] has presented an objectively reasonable fear of involuntary sterilization or other forms of persecution recognized under our asylum laws.").[4]

■ In considering Zheng's claims for asylum and withholding of removal, the IJ relied on his adverse credibility determination, which in turn rested on the undisputed fact that Zheng previously submitted a false application for asylum. Though "well-founded fear" has both subjective and objective components and an applicant must "show that he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility," *Abdille v. Ashcroft,* 242 F.3d 477, 495–96 (3d Cir.2001), this does not imply that it was appropriate for the IJ to ignore the objective evidence supporting Zheng's claims altogether. *See Cordero–Trejo v. INS,* 40 F.3d 482, 491 (1st Cir. 1994) (recognizing the "importance of documentary evidence both in providing a plausible context for an asylum applicant's claim[,] and in making credibility assessments" (citation omitted)).

As a theoretical matter, it would be difficult to conclude that an individual lacks subjective fear where the objective evidence shows that he faces a likelihood of persecution exceeding all but the most metaphysical of doubts. That may or may not be situation here, but the crucial con-

sideration is that the IJ did not assess the evidence bearing on the objective component of the analysis. In the current context, where Zheng's claims have little to do with his credibility but much to do with conditions in China, consideration of only the subjective component of the analysis is unsatisfactory. *Cf. Guo v. Ashcroft,* 386 F.3d 556, 563 (3d Cir.2004) (explaining that the Court and BIA "disconnect adverse credibility from China's family planning policy").

Moreover, in *Guo* we indicated that a prior instance of untruthfulness does not *ipso facto* warrant denying an alien's claim. There the alien initially sought relief based on religious persecution in China, but was found not credible and therefore was unsuccessful. *Id.* at 560. After Guo married, gave birth, and became pregnant a second time, she moved to reopen her immigration proceedings, claiming that she was entitled to asylum on the basis of China's one-child policy. *Id.* The BIA denied her motion to reopen, concluding that she had not addressed adequately the IJ's negative credibility finding. *Id.* We rejected the argument that the prior adverse credibility finding required denying the motion to reopen, as Guo asserted that she was entitled to asylum on an entirely different basis, *i.e.,* China's coerced family-planning policy. *Id.* at 562–63.

The Government's argument reduces to a bad-faith theory of asylum law: once credibility is tarnished, all successive asylum applications are irrebuttably presumed to be false. But case law does not support that once an applicant is deemed uncredible, she is excluded from making further, unrelated asylum

waived. *See Reynolds v. Wagner,* 128 F.3d 166, 178 (3d Cir.1997) ("An argument consisting of no more than a conclusory assertion ... will be deemed waived.").

claims. Nor does one adverse credibility finding beget another.

*Id.* at 562 (internal citations and quotations omitted). Put differently, the IJ's decision is essentially a declaration of *falsus in uno, falsus in omnibus* (false in one, false in all)—a declaration that *Guo* renders impermissible here. Prior to hearing his testimony, the IJ warned Zheng that "[p]eople should avoid lying to me at all cost. That's a general rule. I have no tolerance for it at all and I will detect it very quickly when people do it because I do this all day long. That's all I do here." Given the IJ's overriding concern, it seems likely that his view of Zheng's claims was overly colored by the false application from the outset.

Apart from credibility, the only other ground in the IJ's decision for denying Zheng's future persecution claim was the possibility that his children[5] would not return with him to China:

> With regard to the notion that the respondent now has four children, and cannot return because of the over birth problems that that would present ... [,] the initial problem with that is the Court finds that the respondent lacks credibility.... And if the respondent returns to China as far as this Court is concerned, his wife is still in the United States, and that does not necessarily, therefore, mean that his children are returning with him.

The IJ's acknowledgment of this possibility is suspect for several reasons. First, "the break-up of a family [is] a result at odds ... with significant parts of our overall immigration policy." *Ma v. Ashcroft,* 361 F.3d 553, 561 (9th Cir.2004) (citation omitted); *see also Lau v. Kiley,* 563 F.2d 543, 545 (2d Cir.1977) (describing the "foremost policy underlying the granting of preference visas" under immigration law as the "reunification of families"). Second, the IJ suggested that the fact that Zheng's arrival in the United States without his children reveals a lack of commitment to his family. This suggestion appears to involve a value-laden assessment of Zheng's parenting rather than consideration of his status as a refugee. *Cf. Zhang v. Gonzales,* 405 F.3d 150, 160 (3d Cir. 2005) (McKee, J., concurring) (cautioning that the "issue before the [IJ] was, after all, whether [the applicant] qualified as a 'refugee,' not the quality of her parenting, or her presence in the home"). Third, the IJ's statement that Zheng could abandon his children suggests that any asylum applicant who has been persecuted (other than on the basis of an immutable characteristic) should simply abandon the opinion or association giving rise to the persecution—a suggestion plainly at odds with the objectives of United States asylum law. Lastly, the IJ's suggestion is mere speculation, lacking support in the record.

Accordingly, we remand for consideration of Zheng's aslyum and withholding of removal claims anew.[6] Though we leave

---

5. Two of the four children are United States citizens. The two children born in the United States are eight and seven years old, respectively.

6. We also note the following. Absent changed or extraordinary circumstances, asylum "shall not [be granted] to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C.

§ 1158(a)(2)(B). Whether § 1158 applies in Zheng's case is unclear (he argues it should not apply as he first filed for asylum prior to the statutory amendment that added the time limitation and his subsequent application referred back to the initial application), and, moreover, the one-year limitation appears to have been previously considered by the IJ (who appears to have deemed the 2001 application to be a continuation of the 1994 application). Further, the BIA might determine

this decision to the BIA, we suggest—in view of IJ Pugliese's comments quoted above—assigning this matter to a new IJ.

## IV. CAT

To receive relief from removal under the CAT, an applicant is required to show that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The regulation defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted" by a public official, or with the acquiescence of a public official, for certain purposes and reasons. 8 C.F.R. § 1208.18(a)(1).

Zheng does not argue that the possibility of sterilization warrants relief under the CAT—presumably because his asylum and withholding of removal claims are concerned with China's family planning policies and, in effect, if he succeeds on either, one would not reach his claim under the CAT. Instead, Zheng argues that his unauthorized flight from China may result in imprisonment if he returns, and if imprisoned, Zheng contends, he is likely to be tortured. We have previously concluded, however, that the likelihood of imprisonment in China is not sufficient to warrant relief under the CAT. *Wang v. Ashcroft*, 368 F.3d 347, 350 (3d Cir.2004) (explaining that we would not "assume[ ] first-time returning emigrants should have been included within the list of groups likely to be tortured because of the difficulty of monitoring human rights violations in China . . . ."). Thus, even assuming that Zheng is likely to be imprisoned upon his return, he needs to present additional evidence in support of his claim in order to be entitled to relief under the

that an exception to the one-year limitation applies. *Cf.* 8 U.S.C. § 1158(a)(2)(D). In this

CAT. He has not done so, and his CAT claim must fail.

## V. Conclusion

Zheng's petition for review is granted in part (as to his asylum and withholding of removal claims) and denied in part (as to his CAT claim). Thus, we remand this case to the BIA for further proceedings consistent with this opinion.

context, we leave the § 1158 issues for resolution on remand.