[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 28, 2005
THOMAS K. KAHN
CLERK

_____

No. 05-11125
Non-Argument Calendar

_____

BIA No. A96-442-100

JIU SHU WANG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

(September 28, 2005)

Before BIRCH, HULL and WILSON, Circuit Judges.

PER CURIAM:

Jiu Shu Wang, a native and citizen of China, petitions this court, through

counsel, for review of the Board of Immigration Appeals' ("BIA's") order

adopting and affirming the immigration judge's ("IJ's") decision denying his application for asylum, withholding of removal, and United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT") relief. Because the evidence does not compel a finding that Wang suffered past persecution or has a well-founded fear of future persecution on account of one of the five statutory factors, we **AFFIRM** the BIA's denial of asylum. Substantial evidence also supports the BIA's and IJ's determination that Wang was not entitled withholding of removal. Moreover, substantial evidence supports the IJ's adverse credibility determination. Accordingly, we **DENY** the petition.

## I. BACKGROUND

Wang, a native and citizen of China, entered the United States on 10 May 2003. See AR at 574, 594. On 14 May 2003, the Immigration and Naturalization Service ("INS") issued a notice to appear ("NTA") to Wang, charging him with removability pursuant to INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i), as an alien who, by fraud or willfully misrepresenting a material fact, sought to procure a visa, other documentation, or admission into the United States or other benefit under the INA. The NTA also charged him with removability pursuant to INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an immigrant who, at the time of application for admission, was not in possession of a valid unexpired

2

immigrant visa or other valid entry document as required by the INA, and did not possess a valid passport as required under the regulations issued by the Attorney General.

In his credible fear interview, Wang stated that he left China because he needed to "make a living" because there was "nothing to do at home" and he could "not make a living" in China. Id. at 126. The asylum officer found that Wang established a credible fear of persecution, however, based on Wang's fear of being punished for violating China's coercive family planning policies. Id. at 119-21.

On 4 June 2003, Wang applied for asylum and withholding of removal under the INA and relief under the CAT based on his political opinion. He stated in his application that he was male, single, and did not have any children. Wang stated that while in China, he resided in Fujian. Wang stated that since April 2003, the "Chinese government wanted to jail [him] on account of [his] violation of [the] family planning policy by making [his] girl friend pregnant before marriage." Id. at 563. He averred that his girlfriend became pregnant and they could not register to marry because they were too young. Wang stated that their families were preparing a traditional marriage for them. However, on 11 April 2003, while Wang was in class, his grandmother informed him that he should hide with relatives because the government was seeking him and wanted to put him in jail. He stated that if he were forced back to China, he would be "arrested, jailed and

3

mistreated by [the] Chinese government because [he] violated [the] family planning policy and left China illegally." Id. at 563, 568.

In addition to his application, Wang provided a sworn statement supplementing his asylum application. Id. at 176. Wang indicated that he was also claiming political asylum based on his parents' family planning problems. Wang stated that his mother "told" him that she was forcibly sterilized in May 1989 when Wang was approximately four years old. Wang stated that his family was composed of his mother, father, and younger sister, and he dreamed of having a "big family" to carry on his family name. He also included a picture of him with his girlfriend. Id. at 185.

The record contained the U.S. State Department's 2002 Country Reports on Human Rights Practices for China ("2002 Country Report"), which indicated that China's "one-child policy" was becoming more relaxed, especially in rural areas. Id. at 521-22. The Country Report observed that official policy prohibited forced abortions or sterilizations, but there were instances in which family planning officials used intense pressure and coercion, including forced abortions and sterilization, to meet government goals. Id. at 522. In order to delay childbearing, the Marriage Law set a minimum age to marry, 20 years for women and 22 years for men. Id. at 523. It was illegal in almost all provinces for a single woman to bear a child, but Jilin Province passed a law making it legal if the woman "intends

4

to remain single for life." Id. China had a "floating population" of between 80 and 130 million economic migrants who left their home to seek work in other areas. Id. at 532.

Additionally, the record included the China Country Assessment for October 2002 ("Country Assessment"), which was prepared by the United Kingdom's Country Information and Policy Unit, Immigration and Nationality Directorate, Home Office. Id. at 273. According to the Country Assessment, China began implementing the one-child policy in the 1970s. Id. at 309. The policy was enforced primarily by local authorities, through the use of fines, withholding of social services, and other disciplinary measures. Id. at 310. The Country Assessment further stated that the birth-control policy is enforced less strictly in Fujian, where "forced abortion and sterilization [are] no longer tolerated." Id. at 311-12. In Fujian, fines are referred to as "social subsidy fees," and local authorities often encountered difficulties in collecting the fines. Id. at 312. Many asylum seekers, particularly those from Fujian Province, enlist the services of people-smugglers, known as "snakeheads," to provide them with fraudulent documents with which they can obtain asylum. Id. at 327. The documents provided include false sterilization and abortion certificates, and, according to one specialist on the population of China, "in some US cities there are Chinese

entrepreneurs who for $100 will supply an asylum applicant with an affidavit in English in which all of the answers are sheer invention." Id. at 327-28.

The Country Assessment indicated that China accepts the repatriation of citizens who have entered other countries illegally. Id. at 375. It stated that returnees generally are fined. It further stated that those who have been repatriated a second time are typically sent to labor camp, and people identified as smugglers are criminally prosecuted. Id. The record also contained five previous Country Reports, as well as numerous other articles and reports reiterating China's family planning policies. Id. at 133-545.

On 10 June 2003, Wang admitted to the allegations in the NTA and conceded removability. Id. at 63, 67. At the hearing on Wang's asylum, withholding of removal, and CAT claims, he testified to the following. He was a citizen of China and was applying for political asylum because he violated China's family planning policy. Id. at 72. His grandmother told him that the Chinese authorities came to his house to arrest him when he was not there. Id. at 73. Wang's girlfriend was pregnant with his child, and the Chinese government forced her to abort the pregnancy because they were not married at the time she became pregnant. Id. at 74-75. Wang and his girlfriend wanted to get married but could not because they were not of legal age to marry. Id. at 76. Wang's grandmother told him that his girlfriend had an abortion on 11 April 2003. Id. Wang's

6

girlfriend told Wang that she did not want to have the abortion, but was forced to by the government. Id. at 77. Wang also testified that his mother was forced to undergo an abortion and sterilization in 1989. Id. at 79-80. At the time of the hearing, Wang's parents were living in New York seeking asylum and Wang's girlfriend was living in China. Id. at 74, 86, 90-91.

Wang testified that he left China and traveled alone through Holland, Ecuador, and Costa Rica before he came to the United States. Id. at 82-86. Although he stayed in Ecuador and Costa Rica for several days, he did not seek asylum protection because he did not know "the procedure of making that request." Id. at 83. He testified that he left China illegally through "snake head." Id. at 86-87.

On cross-examination, the government asked Wang why he stated in his credible fear interview that he left China for economic reasons. Id. at 88. Wang responded that he was "confused" and did not know "what to say." Id. He testified that, if he returned to China, he could reside with his sister and stated that his only fear was that he would be "fined and detained for a short period." Id. at 92-93.

The IJ denied Wang's application for asylum and withholding of removal. Id. at 44-57. The IJ noted that Wang only submitted a birth certificate, a picture of a female, and background material that did not contain personal references to

7

himself or any member of his family with his application. Id. at 47. After reviewing the facts, the IJ found that the principle of allowing an alien to qualify as a refugee when the alien's wife has undergone a forced abortion has not been extended to "subsequent family members or further prodigy." Id. at 48-49. The IJ found that Wang failed to submit any evidence to corroborate that the abortion actually took place, including his parents' asylum application since they were residing in the United States at the time of the hearing. Id. The IJ found Wang to be "a very intelligent young man" who was "very articulate," and did not believe that he was "confused" at the airport when he stated that he came to the United States for economic reasons. Id. at 49.

The IJ found that Wang's testimony about his girlfriend's abortion was not supported by documentation or credible. Id. at 49-50. The IJ noted that the family planning policy in China has become more lax in recent years. Id. at 50-51. The IJ stated that country-wide persecution had not been shown because of China's large "floating population." Id. at 50. The IJ found Wang's initial credible fear interview to be truthful, and found the "subsequent story" to be fabricated, possibly by the "snake heads" who helped him leave China. Id. at 51-52. The IJ found that Wang did not establish past persecution, stating that the alleged forced abortion of his mother does not extend to children existing at the time of the abortion. Id. at 52-53. The IJ found that it was "mere conjecture" to want to leave China in the

8

event that Wang wants to have more than one or two children in the future. Id. at

53. The IJ also found that Wang failed to establish future persecution if he were to

return to China. Id. at 53-54. The IJ stated that the country reports generally

indicated that Wang would be fined for re-entering the country after illegally

exiting and, thus, Wang feared prosecution, not persecution. Id. at 54-55.

The IJ also stated that he would "have denied the application as a matter of

discretion for asylum based upon the route that he was taken." Id. at 55. The IJ

stated that he was "satisfied that this is clearly a fraudulent, frivolous application,

but will withhold[] ruling on the same since the Government did not request it."

Id. In addition, the IJ found that Wang failed to meet the higher standard for

withholding of removal or torture as defined under the CAT. Id.

Wang filed a notice of appeal to the BIA, arguing that the IJ erred in finding

his claim was not credible. Id. at 31-36. Wang also stated that he met "the

eligibility criteria for relief from removal." Id. at 36. In Wang's brief, he argued

that he suffered past persecution based on: (1) his girlfriend's forced abortion; and

(2) his mother's forced sterilization. Id. at 6-10.[1] He further argued that the IJ

erred in finding him not credible. Id. at 8-9. Wang argued that he was denied his

Fifth Amendment due process right to a full and fair hearing because of the IJ's

"prejudicial conduct" towards him. Id. at 10-12. Wang also argued that he was

---

[1] AR 7 is blank and is missing from the record.

entitled to CAT relief because the Chinese government's human rights practices were "deteriorating." Id. at 12. The government adopted the IJ's decision as its brief.

The BIA adopted and affirmed the decision of the IJ, stating that it agreed that there were material discrepancies in the record and supported the IJ's conclusion that Wang "failed to provide credible testimony or probative evidence to demonstrate he is a refugee within the meaning of the [INA]." Id. at 2. The BIA also agreed with the IJ's conclusion that Wang failed to meet the definition of a refugee based on his girlfriend's alleged forced abortion.

On appeal, Wang argues that he had demonstrated past persecution based on the fact that he suffered persecution directly through the loss of his child on account of his resistance to the population control program. He argues that he commenced a "de facto marriage relationship with a woman underage" and attempted to father a child with her, but the Chinese government forcibly aborted the pregnancy. Appellant's Br. at 12. Wang argues that he also suffered past persecution based on his girlfriend's forced abortion, arguing that he qualifies as a refugee even though he was not officially married to his girlfriend because he had a "spousal relationship" with her. Id. at 13-17. Wang argues that he fears future persecution because he fears being arrested by the Chinese government for having violated the population control policy. He further argues that he suffered past

10

persecution when his mother was forcibly sterilized when he was a child, citing case law that states that violence directed at family members may support a claim for persecution because it may show that the applicant's fear of persecution is well founded. Wang asserts that the IJ's adverse credibility finding was not supported by substantial evidence, arguing that he merely made an "omission" at the airport interview, and not a "discrepancy" as the IJ and BIA concluded. Id. at 20-23. He argues that the IJ erroneously found that Wang failed to corroborate his claim sufficiently, arguing that his testimony was sufficient. Finally, Wang argues that the IJ erred in finding that Wang had not established country-wide persecution in China, asserting that his supporting documents show that China implements and enforces its population control policies throughout the country.

## II. DISCUSSION

When the BIA issues a separate decision, we review only that decision, "except to the extent that [the BIA] expressly adopts the IJ's opinion." Reyes-Sanchez v. United States Att'y Gen., 369 F.3d 1239, 1242 (11th Cir. 2004). When, as here, "the Board adopts the IJ's reasoning, [this Court] review[s] the IJ's decision as well." Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001).

To the extent that the BIA's and the IJ's decisions were based on a legal determination, our review is de novo. D-Muhumed v. United States Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). The factual determinations are reviewed

11

under the substantial-evidence test, and we must affirm the decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Antipova v. United States Att'y Gen., 392 F.3d 1259, 1261 (11th Cir. 2004) (quotations omitted).  Under this highly deferential standard of review, the BIA's decision must be deferred to if supported by substantial evidence, unless the evidence "compels" a reasonable factfinder to find otherwise. INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1, 112 S. Ct. 812, 815 n.1 (1992).

We review credibility determinations under the substantial evidence test.[2] D-Muhumed, 388 F.3d at 818.  The trier of fact determines credibility under this test, and we "may not substitute its judgment for that of the [IJ] with respect to credibility findings."  Forgue v. United States Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (quotations omitted).  Furthermore,

> [T]he IJ must offer specific, cogent reasons for an adverse credibility finding.  Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence.  A credibility determination, like any fact finding, may not be overturned unless the record compels it.

---

[2] The REAL ID Act of 2005 amended credibility determinations, adding INA §§ 208(b)(3)(B)(iii), 240(c)(4)(C), 8 U.S.C. §§ 1158(b)(3)(B)(iii), 1229a(c)(4)(C).  Section 101(a)(3) and (d), Pub. L. No. 109-13, 119 Stat. 231, 303, 304-05.  The Act states that these provisions "shall apply to applications for asylum, withholding, or other relief from removal made on or after" the date of enactment of the act, 11 May 2005, and, thus, the provisions do not affect this appeal. Pub. L. No. 109-13, 119 Stat. at 305.

Id. at 1287 (citations and quotations omitted). "[T]he IJ's extremely detailed

adverse credibility determination alone may be sufficient to support the IJ's denial

of [a] petition." D-Muhumed, 388 F.3d at 819. As the Third Circuit has pointed

out,

> [a]n immigration judge alone is in a position to observe an alien's tone
> and demeanor, to explore inconsistencies in testimony, and to apply
> workable and consistent standards in the evaluation of testimonial
> evidence. He is, by virtue of his acquired skill, uniquely qualified to
> decide whether an alien's testimony has about it the ring of truth.

Abdulrahman v. Ashcroft, 330 F.3d 587, 597 (3d Cir. 2003).

A. Denial of Request for Asylum and Credibility Determination

Any alien who arrives in or is present in the United States may apply for

asylum, which the Attorney General ("AG") has discretion to grant if the alien is a

"refugee" as defined in 8 U.S.C. § 1101(a)(42)(A). Najjar, 257 F.3d at 1284. That

statute defines a "refugee" as:

> any person who is outside any country of such person's nationality or,
> in the case of a person having no nationality, is outside any country in
> which such person last habitually resided, and who is unable or
> unwilling to return to, and is unable or unwilling to avail himself or
> herself of the protection of, that country because of **persecution or a
> well-founded fear of persecution on account of** race, religion,
> nationality, membership in a particular social group, or **political
> opinion**. . . .

8 U.S.C. § 1101(a)(42)(A) (emphasis added). This statute addresses forced

abortions as follows:

13

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42)(B).  The forced abortion or sterilization of a wife can be imputed to her husband.  See In re C-Y-Z, 21 I&N Dec. 915, 919 (BIA 1997); Zhang v. INS, 386 F.3d 66, 71-72 (2d Cir. 2004); He Chun Chen v. Ashcroft, 376 F.3d 215, 225 (3d Cir. 2004); Ma v. Ashcroft, 361 F.3d 553, 558-59 (9th Cir. 2004).  However, forced abortion or sterilization has not been imputed beyond a marital relationship.  See Zhang v. Ashcroft, 395 F.3d 531, 532 (5th Cir. 2004) (holding that a "live-in girlfriend" is not a recognized relationship for purposes of a cognizable resistence to coercive family planning policy and noting that "merely impregnating one's girlfriend is not alone an act of resistance").  The asylum applicant carries the burden of proving statutory "refugee" status and thereby establishing asylum eligibility.  8 C.F.R. § 208.13(a); D-Muhumed, 388 F.3d at 818.  If he meets that burden, the Secretary of Homeland Security or the Attorney General may exercise discretion to grant asylum.  8 U.S.C. § 1158(b)(1)(A).

14

Accordingly, "[t]o establish asylum eligibility based on political opinion or any other protected ground, the alien must, with credible evidence, establish (1) past persecution on account of [his] political opinion or any other protected ground, or (2) a 'well-founded fear' that [his] political opinion or any other protected ground will cause future persecution." Sepulveda v. United States Att'y Gen., 401 F.3d 1226, 1230-31 (11th Cir. 2005) (per curiam) (citing 8 C.F.R. § 208.13(a), (b)).  Absent corroborating evidence, the applicant's testimony, "if credible, may  be sufficient to sustain the burden of proof."  8 C.F.R. § 208.13(a).

With regard to past persecution, our court has noted that "persecution is an extreme concept, requiring more than few isolated incidents of verbal harassment or intimidation, and . . . mere harassment does not amount to persecution." Sepulveda, 401 F.3d at 1231 (quotations omitted).  "[A]n applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable."  Id. at 1231 (quotation omitted).  Establishing a nexus between the statutorily listed factor and the feared persecution "requires the alien to present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of" the statutorily listed factor.  D-Muhumed, 388 F.3d at 818 (quotation omitted).

"A showing of past persecution creates a presumption of a 'well-founded fear,' subject to rebuttal by the INS."  Najjar, 257 F.3d at 1289 (citing 8 C.F.R §

15

208.13(b)(1)).  If, however, the alien does not establish past persecution, he or she bears the burden of demonstrating a well-founded fear of persecution by showing that (1) he or she fears persecution based on his or her political opinion or other statutorily listed factor; (2) there is a reasonable possibility he or she will suffer persecution if removed to his or her native country; and (3) he or she could not avoid persecution by relocating to another part of his or her country, if under all the circumstances it would be reasonable to expect relocation.  See 8 C.F.R. § 208.13(b)(2), (3)(i).

Here, substantial evidence supports the IJ's and BIA's finding that Wang neither suffered past persecution nor has a well-founded fear of future persecution. See Najjar, 257 F.3d at 1283-84.  First, the IJ and the BIA found Wang not to be credible based on his factually differing stories at the airport interview and specifically made a finding that Wang should have produced corroborating evidence.  AR at 2, 48-49.  A reasonable factfinder would not be compelled to reach a conclusion different than the IJ and the BIA.  As the IJ pointed out, there is a material difference between stating that Wang left China "to make a living," and his statement that he left China because he would be persecuted based on his violation of the coercive family planning policies.  Id. at 51-52, 72, 126.

Furthermore, Wang failed to produce any corroborating evidence other than a picture of an identified female.  See id. at 48-49.  He provided only a vague

16

description of when and how the abortion occurred, and failed to provide any corroboration that he even had a girlfriend in China, although his parents were living in the United States during the hearing. Id. at 72-75, 86. Although an alien's testimony could be sufficient to sustain the burden of proof without corroborating evidence, the IJ specifically found that Wang's claim was not credible and that Wang should have provided corroborating evidence. See 8 C.F.R. § 208.13(a); AR at 48-49. We will not overturn the IJ's decision because a reasonable trier of fact would not be compelled to conclude that such corroborating evidence was unavailable since he could have produced a copy of his parents' asylum application or their testimony since they were residing in the United States during the hearing. See 8 U.S.C. § 1252(b)(4).

The differences between Wang's airport interview and his testimony at the immigration hearing are such that a reasonable factfinder could conclude that Wang's testimony was incredible, and the remainder of the record would not compel a reasonable factfinder to conclude otherwise. See Gao, 299 F.3d at 272; Pop, 270 F.3d at 531-32; Yu, 364 F.3d at 704. "[T]he IJ's extremely detailed adverse credibility determination alone may be sufficient to support the IJ's denial of [a petitioner's] petition," and substantial evidence exists to support the IJ's and the BIA's decision. See Forgue, 401 F.3d at 1287; D-Muhumed, 388 F.3d at 819. Accordingly, we deny the petitioners' petition for review on this ground.

17

Moreover, there is no binding authority concerning whether the forced sterilization or abortion provision would extend to a boyfriend for purposes of meeting the statutory definition of a "refugee," and persuasive authority suggests that it would not. See Zhang, 395 F.3d at 532. Wang relies on the Ninth Circuit's decision in Ma v. Ashcroft, 361 F.3d at 559-61, where the Ninth Circuit held that the forced abortion provision could be imputed to a "common law" spouse where the couple was married but could not legally register their marriage because of the age restrictions. Ma is distinguishable, however, because Wang was not married, officially or unofficially, as evidenced by his asylum application. See AR at 559. In addition, Wang did not cite, and we are unable to find, any authority stating that the forced abortion and sterilization provision could be imputed from a mother to a child who was already born. Thus, Wang's asylum claim based on his girlfriend's or his mother's alleged forced abortion appears to be meritless. Therefore, we deny Wang's petition for review as to his asylum claim on this basis also.

B. Denial of Request for Withholding of Removal

1. Under the INA

Wang fails to make a separate argument of why he is entitled to withholding of removal under the INA. Therefore, his withholding of removal claim is arguably abandoned. See Sepulveda, 401 F.3d. at 1228 n.2. However, since he

briefly sets out the legal requirements for withholding of removal in his brief, we will address it.

The IJ's and BIA's factual determination that an alien is not entitled to withholding of removal must be upheld if it is supported by substantial evidence. See Najjar, 257 F.3d at 1283-84. An alien is entitled to withholding of removal under the INA if he can show that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. Mendoza v. United States Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003); see also INA § 241(b)(3), 8 U.S.C. § 1231(b)(3). If an alien demonstrates past persecution, it is presumed that his life or freedom will be threatened in the future in his native country. 8 C.F.R. § 208.16(b)(1)(i). "The regulations are clear that where an applicant has established past persecution," the burden of establishing changed conditions or the possibility of internal relocation "lies with the INS." Antipova, 392 F.3d at 1264. The well-founded fear standard for withholding of removal "is more stringent than the well-founded fear standard for asylum." D-Muhumed, 388 F.3d at 819 (quotation omitted).

Substantial evidence supports the IJ's and BIA's finding that Wang's life or freedom would not be threatened on account of his political opinion. As noted above, Wang failed to establish past persecution based on his girlfriend's or his mother's alleged forced abortions. The IJ and the BIA found Wang not to be

19

credible, and "the IJ's extremely detailed adverse credibility determination alone may be sufficient to support the IJ's denial of [a petitioner's] petition." Id. at 819. Therefore, based on the adverse credibility finding, combined with the finding on the absence of corroborating evidence, substantial evidence exists to support the IJ and the BIA's decision. See Forgue, 401 F.3d at 1287; D-Muhumed, 388 F.3d at 819; 8 U.S.C. § 1252(b)(4). Therefore, Wang's withholding of removal claim is denied based on this ground.

2. Under the CAT

Wang argues that he established entitlement to CAT relief because he fears being tortured at the hands of the Chinese government for illegally leaving the country.

As noted above, the IJ and BIA's factual determination that an alien is not entitled to withholding of removal must be upheld if it is supported by substantial evidence. See Najjar, 257 F.3d at 1283-84. To obtain withholding of removal under the CAT, the burden is on the applicant to establish that it is "more likely than not" he will be tortured in the country of removal. 8 C.F.R. § 208.16(C). "Torture" is defined as

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or

20

coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1). The burden of proof for an applicant for withholding of removal under the CAT, as with the applicant seeking withholding under the INA, is higher than the burden imposed on an asylum applicant. Najjar, 257 F.3d at 1303-04.

Substantial evidence supports the IJ's and BIA's determination that Wang is not entitled to CAT relief. Wang argues that he will be tortured if he returned to China because he emigrated illegally. However, as he stated at his asylum hearing, he fears that he will be "detained and given a fine" for violating the family planning policy and for leaving the country "through the snake head." AR at 86. The U.K. Country Assessment indicated that China accepts the repatriation of citizens who have entered other countries illegally, and returnees generally are fined. Id. at 375. It further stated that those who have been repatriated a second time are typically sent to labor camp, and people identified as smugglers are criminally prosecuted. The IJ found that since this was Wang's first repatriation, he would probably only be fined. Further, the IJ found that it would only be prosecution, not persecution. The record supports that finding. Thus, substantial

evidence supports the IJ's and BIA's determination that Wang is not entitled to CAT relief.

### III.  CONCLUSION

For the reasons stated above we **AFFIRM** the BIA's denial of Wang's claims for asylum and withholding of removal under the INA and the CAT.

**PETITION DENIED**.