**NATURAL RESOURCES DEFENSE COUNCIL, et al. Plaintiffs,**

v.

**Donald C. WINTER, et al., Defendants.**

**No. 8:07–cv–00335–FMC–FMOx.**

United States District Court,
C.D. California.

Feb. 4, 2008.

Alan J. Heinrich, Alison Plessman, Irell & Manella, Los Angeles, CA, Andrew Elsas Wetzler, Cara Ann Horowitz, Natural Resources Defense Council, Santa Monica, CA, Gregory Alan Fayer, Irell and Manella, Los Angeles, CA, Joel R. Reynolds, Natural Resources Defense Council, Santa Monica, CA, Joshua B. Gordon, Richard B. Kendall, Irell & Manella, Los Angeles, CA, for Natural Resources Defense Council Inc.

Andrew Elsas Wetzler, Cara Ann Horowitz, Natural Resources Defense Council, Santa Monica, CA, Gregory Alan Fayer,

Irell and Manella, Los Angeles, CA, Joel R. Reynolds, Natural Resources Defense Council, Santa Monica, CA, Joshua B. Gordon, Richard B. Kendall, Irell & Manella, Los Angeles, CA, for International Fund for Animal Welfare, Cetacean Soc. International, League for Coastal Protection, Ocean Futures Soc.

Andrew Elsas Wetzler, Cara Ann Horowitz, Natural Resources Defense Council, Santa Monica, CA, Joel R. Reynolds, Natural Resources Defense Council, Santa Monica, CA, for Jean–Michel Cousteau.

Assistant U.S. Attorney SA-CV, AUSA–Office of US Attorney, Santa Ana Branch–Civ. Div., Santa Ana, CA, Charles R. Shockey, AUSA Office of the US Attorney, Environmental & Natural Resources Div., Sacramento, CA, Guillermo Montero, US Dept. of Justice, Natural Resources Sec., Luther L. Hajek, US Dept of Justice, Environment and Natural Resources Div.–Wildlife Sec., Denver, CO, George S. Cardona, AUSA–Office of US Attorney, Crim. Div., Los Angeles, CA, for Donald C. Winter, Sec. of the Navy, U.S. Dept. of the Navy, National Marine Fisheries Service, William Hogarth Assistant Admin. for Fisheries of the National Oceanographic and Atmospheric Admin., Vice Admiral Conrad C. Lautenbacher, Jr., Admin. of the National Oceanographic and Atomospheric Admin.

Assistant U.S. Attorney SA-CV, AUSA–Office of US Attorney, Santa Ana Branch–Civ. Div., Santa Ana, CA, Charles R. Shockey, AUSA Office of the US Attorney, Environmental & Natural Resources Div., Sacramento, CA, George S. Cardona, AUSA–Office of US Attorney, Crim. Div., Los Angeles, CA, Guillermo Montero, US Dept. of Justice, Natural Resources Sec., Luther L. Hajek, US Dept of Justice, Environment and Natural Resources Div.–Wildlife Sec., Denver, CO, Michael R. Eitel, US Dept. of Justice, Environment and natural Resources Div.–Wildlife Sec., Denver, CO, for Carols M. Gutierrez, Sec. of the Dept. of Commerce.

Jamee Jordan Patterson, CAAG–Office of Attorney General of California, San Diego, CA, for California Coastal Com'n.

## ORDER DENYING DEFENDANTS' EX PARTE APPLICATION TO VACATE PRELIMINARY INJUNCTION OR TO PARTIALLY STAY PENDING APPEAL AND ORDER VACATING TEMPORARY STAY

FLORENCE-MARIE COOPER, District Judge.

This matter is before the Court on remand from the Ninth Circuit Court of Appeals. The Court was instructed to consider the effect of recent executive actions on its January 3, 2008 Order issuing a preliminary injunction, as modified January 10, 2008, and its January 14, 2008 Order Denying Defendants' Application for a Stay Pending Appeal. The Court has read and considered the Ninth Circuit's Order, as well as Defendants' Application for Immediate Vacatur or Partial Stay Pending Appeal, (docket no. 131, filed January 17, 2008), Plaintiffs' Opposition, and Defendants' Reply thereto. For the reasons and in the manner set forth below, the Court's Orders stand and Defendants' Application is DENIED. The temporary, partial stay is lifted (docket no. 133).

## SUMMARY

In this Order, the Court concludes that its preliminary injunction is not affected by the Council on Environmental Quality's (CEQ) approval of emergency alternative arrangements because there is no emergency. The CEQ's action is beyond the scope of the regulation and is invalid. The Navy is not, therefore, exempted from compliance with the National Environmental Policy Act and this Court's injunction.

The Court also expresses significant concerns about the constitutionality of the

President's exemption of the Navy from the requirements of the Coastal Zone Management Act. However, because a finding on this issue is not necessary to the result reached, the Court adheres to the doctrine of constitutional avoidance and does not resolve that issue.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs, a coalition of environmental protection groups and a concerned individual (led by the Natural Resources Defense Counsel (NRDC)),[1] brought suit challenging the United States Navy's[2] use of mid-frequency active (MFA) sonar during training exercises off the coast of Southern California.[3] MFA sonar is a tool that has proven far more effective at detecting modern quiet-running diesel electric submarines than passive sonar. (Decl. of Capt. Martin May ¶¶ 8–10.) MFA sonar, which generates underwater sound at extreme pressure levels, has the unfortunate side effect of inflicting harm on marine life, up to and including death.[4] (*See, e.g.*,

1. Plaintiffs (hereinafter referred to as "Plaintiffs" or "NRDC") are: the NRDC, the International Fund for Animal Welfare, Cetacean Society International, League for Coastal Protection, Ocean Futures Society, and Jean–Michel Cousteau. The California Coastal Commission (CCC) has intervened.

2. Defendants (hereinafter referred to as "Defendants" or "the Navy") are: Donald C. Winter, Secretary of the Navy; the United States Department of the Navy; Carlos M. Gutierrez, Secretary of Commerce; the National Marine Fisheries Service (NMFS); William Hogarth, Assistant Administrator for Fisheries, National Oceanographic and Atmospheric Administration (NOAA); and Vice Admiral Conrad C. Lautenbacher, Jr., Administrator, NOAA.

3. This case is one in a series challenging the Navy's use of active sonar in its training exercises. In 2005, the NRDC filed suit challenging the sufficiency of the Navy's compliance with environmental laws, with respect to its sonar use. *Natural Res. Def. Council v. Winter*, CV 05–7513 FMC (FMOx) (C.D.Cal.). That case is pending.

In June 2006, the same plaintiffs filed suit against the same defendants, seeking to enjoin the Navy from using MFA sonar during its Rim of the Pacific (RIMPAC) war games. *Natural Res. Def. Council v. Winter*, CV 06–4131 FMC (JCx) (C.D.Cal.). Following this Court's order granting Plaintiffs' application for a temporary restraining order, the parties entered into a settlement agreement. *Id.*, Temporary Restraining Order (July 3, 2006). Among other measures, the Navy agreed to: (1) use aircraft and passive acoustic sonar to aid in spotting marine mammals; (2) abstain from using MFA sonar in the Northwestern Hawaiian Islands Marine National Monument, or within 25 nautical miles thereof; (3) limit use of MFA sonar to antisubmarine warfare training exercises; and (4) publicize the NMFS's stranding hotline telephone number to ensure public awareness. *Id.*, Settlement Agreement at 3–4 (July 7, 2006).

In 2007, the California Coastal Commission (CCC) (intervenor in the present case) filed suit against the Navy. That suit has been stayed pending resolution of the appeal in this case. *Cal. Coastal Comm'n v. U.S. Dep't of the Navy*, CV 07–1899 FMC (FMOx) (C.D. Cal.).

4. The tension between military preparedness and environmental protection has received a great deal of scholarly attention of late. *E.g.*, Hope Babcock, *National Security and Environmental Laws: A Clear and Present Danger?* 25 Va. Envtl. L.J. 105, 107 (2007) ("The events of 9/11 have also brought into sharp focus a conflict that this country has not witnessed since the Cold War: the clash between the safety and continuation of the Republic and other values we hold dear, among them a healthy environment."); Colonel E.G. Willard, Lt. Col. Tom Zimmerman & Lt. Col. Eric Bee, *Environmental Law and National Security: Can Existing Exemptions in Environmental Laws Preserve DoD Training and Operational Prerogatives without New Legislation?*, 54 A.F. L.Rev. 65 (2004) (discussing ways to address the military's growing concerns "in recent years about the impacts of growth and environmental requirements on training and operations"); Nancye L. Bethurem, *Environmental Destruction in the Name of National Security: Will the Old Paradigm Return in the*

Decl. of Thomas Jefferson ¶ 4 and sources cited therein.)

The Navy plans to use MFA sonar during fourteen large-scale training exercises (involving various ships, submarines, amphibious vehicles, rotary and fixed-wing aircraft, and live ordinance) off the coast of southern California between February 2007 and January 2009. (Decl. of Luther Hajek, Ex. 1 at 2–1 to 2–24.) As of this writing, eight exercises have yet to take place. (*See* Defs.' Reply in Supp. of Ex Parte Application.) The Navy's own Environmental Assessment (EA) reports that these activities, comprised of Composite Training Unit Exercises (COMPTUEX) and Joint Task Force Exercises (JTFEX), will result in approximately 170,000 "takes"[5] of marine mammals. (*Id.* at 4–46 to 4–47.) These takes are predominantly "Level B harassment exposures," in which marine mammals would be subjected to sound levels of between 170 and 195 decibels,[6] but also include approximately 8,000 exposures powerful enough to cause a temporary threshold shift in the affected mammals' sense of hearing and an additional 466 instances of permanent injury to beaked and ziphiid whales. (*Id.*)

Despite these findings, the Navy concluded that its JTFEX and COMPTUEX exercises in the Southern California Operating Area (SOCAL) would not cause a significant impact on the environment and on that basis decided that the National Environmental Policy Act (NEPA) did not require it to prepare an Environmental Impact Statement (EIS). In addition, the Navy determined that the use of MFA sonar would not affect natural resources in California's coastal zone. Therefore, the Navy submitted a "consistency determination" (CD) to the California Coastal Commission (CCC) for the exercises that did not take the planned use of MFA sonar into account. It also refused to adopt the mitigation measures the CCC subsequently determined were necessary for the Navy's actions to comply with the California Coastal Management Program (CCMP). (*See* Decl. of Cara Horowitz, Ex. 67 at 9.)

## I. Preliminary Injunction

On March 22, 2007, Plaintiffs filed this action against Defendants, seeking declaratory and injunctive relief for Defendants' violations of NEPA, the Endangered Species Act (ESA), the Administrative Procedures Act (APA), and the Coastal Zone Management Act (CZMA). On June 22, 2007, Plaintiffs moved for a preliminary injunction to enjoin the Navy's use of MFA sonar during the SOCAL exercises "until the Navy adopts mitigation measures that would substantially lessen the likelihood of serious injury and death to marine life." In August 2007, after full briefing and oral argument, this Court granted Plaintiffs' Motion for a Preliminary Injunction. Finding Defendants' mit-

---

*Wake of September 11?*, 8 Hastings W.-Nw. J. Envtl. L. & Pol'y 109, 110 (2002) (discussing the Cold War calculation that the military preparedness was worth its price in concomitant environmental damage); Stephen Dycus, *Osama's Submarine: National Security and Environmental Protection after 9/11*, 30 Wm. & Mary Envtl. L. & Pol'y Rev. 1 (2005) (discussing efforts to amend environmental laws on national security grounds).

5. The term "take," as defined in the Endangered Species Act, means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

6. Decibels are a logarithmic measurement, such that an increase of 10 dB is equivalent to a tenfold increase in acoustic energy. To put these sound levels in perspective, OSHA requires hearing protection to be used where workers are exposed to a sound level of 90 dB for eight hours or 110 dB for as little as thirty minutes. 29 C.F.R. § 1910.95(a).

igation measures "woefully inadequate and ineffectual," the Court concluded that Plaintiffs had demonstrated a likelihood of success on their NEPA, CZMA, and APA claims, but not their ESA claim. Particularly relevant here is the Court's finding that Defendants' failure to prepare an Environmental Impact Statement (EIS) pursuant to NEPA contradicted their own scientific findings.

## II. Mitigation Measures

On August 31, 2007, a panel of the Ninth Circuit Court of Appeals stayed the injunction pending appeal. *Natural Res. Def. Council v. Winter*, 502 F.3d 859 (2007). On November 13, 2007, another panel of the Ninth Circuit remanded to this Court, finding that while Plaintiffs had demonstrated a likelihood of success, the Navy's training with MFA sonar could go forward with the appropriate mitigation measures. *Natural Res. Def. Council v. Winter*, 508 F.3d 885 (2007). The order gave the Court until January 4, 2008 to issue a revised injunction, incorporating mitigation measures.

On November 27, 2007, a status conference was held, in which the Court ordered the parties to meet and confer by December 3, 2007 to attempt to agree on mitigation measures. No stipulation was reached. Accordingly, the parties presented possible mitigation measures to the Court. On December 27, 2007, the Court toured the *USS Milius* at the naval base

in San Diego, California, to improve its understanding of the Navy's sonar training procedures and the feasibility of the parties' proposed mitigation measures. Counsel for both Plaintiffs and Defendants were present.

Plaintiffs proposed a number of broad measures to limit the impact of MFA sonar on marine life. These measures included: (1) a 25 nautical mile coastal exclusion, (2) exclusion of the Catalina Basin, (3) exclusion of the Westfall seamount, (4) exclusion of Cortez and Tanner Banks, and (5) locating exercises to the maximum extent possible in waters deeper than 1,500 meters. Defendants, by contrast, sought to maintain the *status quo*. The Navy offered to continue employing the mitigation measures outlined in the 2007 National Defense Exemption ("NDE"),[7] as well as several additional measures. These included: (1) powering down MFA sonar by 6 dB when marine mammals approach within 1,000 meters; powering down an additional 4 dB at 500 meters; and securing MFA sonar at 200 meters; (2) employing two dedicated, and three non-dedicated, marine mammal lookouts at all times when MFA sonar is being used, and providing such lookouts with binoculars, night vision goggles, and infrared sensors; (3) staying outside the Channel Islands National Marine Sanctuary, and remaining 5 nautical miles from San Clemente Island's western shore, and 3 nautical miles from

7. Defendants have repeatedly described the NDE as laying out "29 mitigation measures." In actual effect, the NDE consists of four basic measures: (1) personnel training (providing approved Marine Species Awareness Training materials for lookouts and commanding officers), (2) on-deck lookouts, armed with binoculars or night vision goggles, to watch for marine mammals, (3) operating procedures to ensure that any sightings of marine mammals are communicated up the chain of command, so that MFA sonar is powered down when a marine mammal approaches within 1,000 yards, 500 yards, and "secured" (shut-down) at 200 yards, and (4) coordination and reporting procedures. (January 23, 2007 Mem. from Deputy Sec'y of Def. to Sec'y of the Navy Regarding Nat'l Def. Exemption.) In reality, the fourth category of "mitigation measure" does not mitigate actual harm to marine mammals but assists the Navy and the NMFS in determining the impacts of its exercises. The Court also notes that the NDE now in effect is the 2007 NDE, and not the NDE issued on June 30, 2006 that is also part of the record.

its other shores; (4) aerial monitoring for at least sixty minutes before MFA sonar exercises along the Tanner and Cortez Banks during blue whale migration (July to September 2008); and (5) pre-exercise monitoring of gray whale off-shore migration patterns between March 7–21, 2008 and April 15–May 15, 2008.

In crafting its January 3, 2008 Order, the Court determined that while Defendants' proposed measures were inadequate, Plaintiffs' proposed measures were too sweeping. In particular, the Court accepted Defendants' representations that the bathymetry off Southern California's shores presents unique training opportunities. (*See* Decl. Rear Admiral John M. Bird in Supp. of Defs.' Mem. Regarding a Tailored Prelim. Inj. at 17 (stating that MFA sonar training must be conducted at night, in low-visibility conditions, and in the varying bathymetry present in Southern California's littoral regions to be realistic)). Accordingly, the Court did not impose additional restrictions on Defendants' training exercises at night or during low visibility conditions. The Court rejected Plaintiffs' calls for a 25 nautical mile coastal exclusion zone (as the parties had previously agreed to in Hawaii for the RIMPAC exercises), accepting Defendants' concession that the Navy could maintain a 12 nautical mile exclusion zone without comprising the quality of its training. (*Id.* at 41–42 (stating that the Navy could restrict training to the defined exercise range, whose eastern boundary does not reach closer than 12 nautical miles to the coast)). For the same reason, the Court refused to preclude naval training around seamounts, near the Tanner and Cortez Banks, or in waters shallower than 1,500 meters.

Instead, the Court opted to forego broad geographical exclusions in favor of meas-ures to promote the sighting of whales and a larger "safety zone" to prevent injurious exposure to MFA sonar. Specifically, the Court ordered the Navy to improve monitoring efforts by: instituting aerial monitoring for sixty minutes before exercises using MFA sonar, providing lookouts with NMFS and NOAA training, and to use existing passive acoustic monitoring devices to the extent possible. In addition, the Navy was ordered to maintain a 12 nautical mile coastal exclusion zone; secure MFA sonar when marine mammals were spotted within 2,200 yards; power down MFA sonar in the presence of significant surface ducting conditions, which cause sound to travel further at higher intensities than it otherwise would; and avoid the use of MFA sonar in the geographically restricted, biologically rich Catalina Basin.

Defendants sought a stay pending appeal on January 9, 2008. On January 10, 2008, perceiving in Defendants' stay application a misapprehension of its January 3, 2008 Order, and an inadvertent omission by the Court, the Court issued a modified injunction to clarify its meaning. On January 11, 2008, Defendants' filed their notice of appeal. On January 14, 2008, the Court denied Defendants' application for a stay pending appeal.

### III. Subsequent Executive Actions

On January 15, 2008, the day after this Court denied the Navy's application for a stay pending appeal, the President issued a memorandum exempting the Navy from compliance with the Coastal Zone Management Act.[8] Stating that compliance with the CZMA would "undermine the Navy's ability to conduct realistic training exercises," the President concluded that the exer-

---

8. The Memorandum reads in its entirety:
   By the authority vested in me as President by the Constitution and the laws of the United States, including section 1456(c)(1)(B) of title 16, United States Code, and to ensure effective and timely

training of the United States naval forces in anti-submarine warfare using mid-frequency active sonar:
   I hereby exempt from compliance with the requirements of section 1456(c)(1)(A) of title 16 (section 307(c)(1)(A) of the Coastal

cises "are in the paramount interest of the United States" and exempted the Navy from compliance. Mem. for Secretary of Defense and Secretary of Commerce, Presidential Exemption from the Coastal Zone Management Act (January 15, 2008); Decl. Michael Eitel Ex. 18.

Also on January 15, 2008, the Council on Environmental Quality (CEQ), citing 40 C.F.R. § 1506.11, approved "alternative arrangements" for the Navy to comply with NEPA because "emergency circumstances" prevented normal compliance. The CEQ's letter of explanation to the Navy states that the modified injunction issued by this Court "imposes training restrictions ... that continue to create a significant and unreasonable risk that Strike Groups will not be able to train and be certified as fully mission capable." (CEQ Letter to Donald C. Winter at 3.) After describing parts of this Court's injunction, the CEQ states that "the inability to train effectively with MFA sonar puts the lives of thousands of Americans directly at risk.... Therefore, there are urgent

national security reasons for providing alternative arrangements under the *CEQ* regulations." The alternative arrangements include: (1) providing notice to the public regarding ongoing EIS preparation; (2) a commitment to continue research measures "for continual improvement in the quality of information" on the "quantity, distribution, migration, and reactions of marine mammals to MFA sonar;" and (3) maintaining the "29 NDE mitigation measures." (*Id.* at 5–8.)

On the same day, citing these actions by the President and the CEQ, Defendants applied to the Ninth Circuit to vacate the injunction, arguing that the legal bases for the injunction had been eliminated. The next day, January 16, 2008, the Ninth Circuit remanded to this Court to allow it to consider the effect of the President's Order and the CEQ's alternative arrangements on the Court's preliminary injunction "and, in particular, to consider whether these legal developments merit vacatur or a partial stay of the injunction." *NRDC v. Winter,* 513 F.3d

Zone Management Act) those elements of the Department of the Navy's anti-submarine warfare training during Southern California Operating Area Composite Training Unit Exercises (COMPTUEX) and Joint Task Force Exercises (JTFEX) involving the use of mid-frequency active sonar. These exercises are more fully described in the Environmental Assessment/Overseas Environmental Assessment prepared for the Commander, United States Pacific Fleet, dated February 2007.

On January 3, 2008, as modified January 10, 2008, the United States District Court for the Central District of California determined that the Navy's use of mid-frequency active sonar was not in compliance with section 1456(c)(1)(A), and issued an order that is appealable under section 1291 or 1292 of title 28, United States Code. On January 11, 2008, the Secretary of Commerce made a written request that the Navy be exempted from compliance with section 1456(c)(1)(A) in its use of mid-frequency active sonar during COMPTUEX and

JTFEX. As part of this request, the Secretary of Commerce certified that mediation under section 1456(h) is not likely to result in the Navy's compliance with section 1456(c)(1)(A).

I hereby determine that the COMPTUEX and JTFEX, including the use of midfrequency active sonar in these exercises, are in the paramount interest of the United States. Compliance with section 1456(c)(1)(A) would undermine the Navy's ability to conduct realistic training exercises that are necessary to ensure the combat effectiveness of carrier and expeditionary strike groups. This exemption will enable the Navy to train effectively and to certify carrier and expeditionary strike groups for deployment in support of world-wide operational and combat activities, which are essential to national security.

(Signed) George W. Bush

Mem. for Secretary of Defense and Secretary of Commerce, Presidential Exemption from the Coastal Zone Management Act (January 15, 2008).

920, 2008 WL 170312, 2008 U.S.App. LEXIS 1423.

Accordingly, the Court here considers two narrow questions: (1) whether the CEQ's approval of alternative arrangements to comply with NEPA, pursuant to 40 C.F.R. § 1506.11, requires the Court to vacate or stay its injunction, and (2) whether the President's Memorandum exempting the Navy from compliance with the Coastal Zone Management Act requires the Court to vacate or stay its injunction.

## DISCUSSION

### I. The National Environmental Policy Act (NEPA)

#### A. Legal Basis for CEQ's Action—40 C.F.R. § 1506.11

CEQ's approval of "Emergency Alternative Arrangements" (in lieu of preparation of an EIS) for the Navy's use of MFA sonar in connection with the eight remaining SOCAL COMPTUEX and JTFEX is predicated solely on its purported authority to grant such relief under 40 C.F.R. § 1506.11, which provides:

Emergencies.

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the Federal agency taking the action should consult with the Council about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

40 C.F.R. § 1506.11. This regulation, together with other regulations "implementing the procedural provisions of NEPA," was promulgated in 1978, in response to Executive Order 11,991, issued by President Carter. *See* Proposed Regulations

for Implementing Procedural Provisions, 43 Fed.Reg. 25230 (June 9, 1978). Prior to that time, CEQ exercised its powers only in an advisory capacity, without any formal rulemaking authority. *See* Exec. Order No. 11,514 § (3)(h), 3 C.F.R. 106 (1970 comp.).

The reputed goals of the regulations as a whole were to "make the environmental impact statement process more useful to decisionmakers and the public; and to reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives." Exec. Order No. 11,991 § 1, 3 C.F.R. 124 (1978) (amending subsection (h) of section (3) of Exec. Order No. 11,514). CEQ was further entrusted to "include in its regulations procedures (1) for the early preparation of environmental impact statements, and (2) for the referral to the Council of conflicts between agencies concerning the implementation of the [NEPA]." *Id.*

As required, the current regulations provide detailed procedures for the timing and preparation of an EIS, as well as for referral of interagency disagreements. *See, e.g.*, 40 C.F.R. pts. 1502 ("Environmental Impact Statement"), 1504 ("Predecision Referrals to the Council of Proposed Federal Actions Determined to be Environmentally Unsatisfactory"). 40 C.F.R. § 1506.11 is located at the end of part 1506, which is entitled "Other Requirements of NEPA." No definitions of the phrase "emergency circumstances" or references thereto are contained in 1506.11 or in any other regulatory or statutory provision.

#### B. 40 C.F.R. § 1506.11 Cannot Encompass the Activity at Issue In This Case Because There Are No "Emergency Circumstances"

The Navy maintains that CEQ's grant of "Emergency Alternative Arrangements"

deprives Plaintiffs of the "likelihood of success on the merits" of their NEPA claims. Therefore, there is no basis for the Court's issuance of preliminary injunctive relief. Specifically, the Navy urges the Court to find that CEQ's "emergency" determination effectively absolves it of the requirement to prepare an EIS prior to commencing (and completing) the remaining SOCAL COMPTUEX and JTFEX. Plaintiffs counter by insisting that CEQ's actions are beyond the scope of the regulation and/or otherwise invalid.

### 1. CEQ's Interpretation of 40 C.F.R. § 1506.11 Is Not Entitled to Deference by This Court

■ The Navy repeatedly insists that CEQ's findings regarding the existence of an "emergency" warranting the provision of alternatives to the EIS process are entitled to great deference. However, although courts have a long tradition of deferring to agency interpretations and decisions in their area(s) of expertise, this deference is nuanced and qualified in several important ways.

■ First, it is a well entrenched principle of administrative law that courts afford deference to an agency's reasonable interpretation of a *statute* it administers, "if the statute is silent or ambiguous with respect to the specific issue . . . ." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Resident Councils v. Leavitt,* 500 F.3d 1025, 1034 (9th Cir.2007) ("When relevant statutes are silent on the salient question, we assume that Congress has implicitly left a

void for an agency to fill . . . . [and] must therefore defer to the agency's construction of its governing statutes, unless that construction is unreasonable.") (quoting *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.,* 126 F.3d 1158, 1169 (9th Cir.1997) (citing *Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778)) (alteration in original). Second, Courts afford deference to an agency's interpretation of its own *regulations* unless "an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *see also Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) (an agency's interpretation of its own regulation is "controlling" if it is not "plainly erroneous or inconsistent" with the regulation); *Or. Natural Res. Council Fund v. Brong,* 492 F.3d 1120, 1125 (9th Cir.2007) ("Though we normally afford deference to an administrative agency's interpretation of its own regulations, an agency's interpretation does not control, where . . . it is plainly inconsistent with the regulation at issue.") (internal quotations and citations omitted); *Alaska Trojan P'ship v. Gutierrez,* 425 F.3d 620, 627–628 (9th Cir.2005).

Here, Plaintiffs do not argue that NEPA disallows exceptions for emergencies under *any* circumstances and, concomitantly, that CEQ's promulgation of 40 C.F.R. § 1506.11 was improper in the first instance.[9] Rather, Plaintiffs challenge

9. At one point in their papers, Plaintiffs suggest that CEQ is invested with less than full rulemaking authority because its rulemaking power is derived from an executive order rather than a Congressional delegation, but do not elaborate further or request that the Court invalidate 40 C.F.R. § 1506.11 on its face. *But see* Robert Orsi, *Emergency Excep-*

*tions from NEPA: Who Should Decide?,* 14 B.C. Envtl. Aff. L.Rev. 481, 500–501 (Spring 1987) (suggesting that "[b]y promulgating an emergency exemption which may allow noncompliance with the EIS requirement, CEQ may have gone beyond the scope of the authority granted it by executive order 11,991 . . . .")

CEQ's application of the regulation to the facts of the present case, on the grounds that the term "emergency circumstances" cannot be afforded so broad an interpretation as to encompass the Navy's need to continue its long-planned, routine sonar training exercises unmitigated by this Court's order. Accordingly, the Court confines its inquiry to the issue of whether the plain language of the regulation and limited indicia of the agency's original intent compel a more limited interpretation than that afforded by CEQ, thus removing its determination from deferential treatment under *Shalala* and *Seminole Rock*, *supra*.

### a. Plain Meaning/Ordinary Usage

Plaintiffs urge that a plain reading of the regulation reveals that its "manifest purpose" is to "permit the government to take immediate remedial measures in response to urgent and unforeseen circumstances not of the agency's own making...." (NRDC Opp'n at 8.) Standard dictionary definitions and the common understanding of the term "emergency" certainly support this reading, as does the language of the regulation itself, which requires that the alternative arrangements be limited to those "necessary to control the *immediate* impacts of the emergency."[10] Indeed, the California Environmental Quality Act (CEQA), which is based on NEPA, defines the term "emergency" to encompass significant, unanticipated occurrences, such as natural disasters. *See* Cal. Pub. Res.Code § 21060.3 (" 'Emergency' means a sudden, unexpected occurrence, involving a clear and immi-

nent danger, demanding immediate action to prevent or mitigate loss of, or damage to, life, health, property, or essential public services. [It] includes such occurrences as fire, flood, earthquake, or other soil or geologic movements, as well as such occurrences as riot, accident, or sabotage.").

Notwithstanding this reality, the Navy argues that limiting the regulation's substantive and temporal scope and denying deference to CEQ's findings would be inconsistent with the few other decisions in which courts have endeavored to review whether "alternative arrangements" were warranted under 40 C.F.R. § 1506.11. However, all of those cases involved circumstances of great urgency.

For example, in *Valley Citizens for a Safe Environment v. Vest,* 1991 WL 330963, 1991 U.S. Dist. LEXIS 21863 (D.Mass.1991), the court upheld "alternative arrangements" which permitted the Air Force to fly C–5A transport planes into and out of Westover Air Force Base on a twenty-four hour schedule, in contravention of the terms of an operative EIS. CEQ approved the arrangements in lieu of the Air Force's preparation of a supplemental EIS (SEIS), on the basis that the modified flight schedule was essential to supply military equipment and personnel for Operation Desert Storm. 1991 WL 330963 at *2, 1991 U.S. Dist. LEXIS 21863 at *6–7. The Plaintiff, a non-profit citizens' association, sought to enjoin the increased flight activity until and unless an SEIS was completed. *Id.* at *2, 1991 U.S. Dist. LEXIS 21863 at *7. In reaching its decision, the court found that CEQ and the

---

**10.** For example, the online version of the Oxford English Dictionary defines emergency as "[t]he arising, sudden or unexpected occurrence (of a state of things, an event, etc.)." Oxford English Dictionary Online, *available at* http://dictionary.oed.com/. The Black's Law Dictionary entry for "emergency circumstances" cross-references "exigent circum-

stances," which include "[a] situation that demands unusual or immediate action and that may allow people to circumvent usual procedures, as when a neighbor breaks through a window of a burning house to save someone inside." Black's Law Dictionary 260, 562 (8th ed.2004).

Air Force's determination that the Middle East crisis (*i.e.,* Iraq's invasion of Kuwait) constituted an "emergency" was a "reasonable" one, "given the military's operational and scheduling difficulties and the hostile and unpredictable nature of the Persian Gulf region." *Id.* at *5, 1991 U.S. Dist. LEXIS 21863 at *18.

Although this case also involves military operations, it is markedly different from *Valley Citizens.* First and foremost, other than this Court's issuance of its injunction, the Navy and CEQ do not identify any changed circumstances (much less the presence of increased hostilities in a specific region) that would justify invocation of 40 C.F.R. § 1506.11. (*See* Reply at 13–14 ("CEQ considered the expert evidence submitted by the Navy that the training restrictions *imposed in this Court's January 3 Injunction, as modified on January 10,* are likely to make anti-submarine warfare training in the exercises in question ineffective ....") (emphasis added); *see also* CEQ Letter at 4 ("[T]he Navy cannot ensure the necessary training to certify strike groups for deployment *under the terms of the injunctive orders.*") (emphasis added)). In addition, the Court's issuance of an injunction in this case was not a sudden or unanticipated event; the Navy has been litigating this case for over ten months and has been involved in parallel litigation for even longer. The Navy's current "emergency" is simply a creature of

its own making, *i.e.,* its failure to prepare adequate environmental documentation in a timely fashion, via the traditional EIS process or otherwise.[11]

The district court's decision in *Crosby v. Young,* 512 F.Supp. 1363 (E.D.Mich.1981) and the D.C. Circuit's decision in *National Audubon Society v. Hester,* 801 F.2d 405 (D.C.Cir.1986), are also unhelpful to the Navy's position. In each of those cases, deference was given to CEQ's "emergency" determination based on facts suggesting the need to avert imminent crises outside the agency's control. *See, e.g., Crosby,* 512 F.Supp. at 1380, 1386 (City's need to obtain commitment of federal funding for a development project by a date certain); *Hester,* 801 F.2d at 405–07 (prevention of extinction of California condor). These legitimate crises stand in stark contrast to the Navy's routine training exercises and are consistent with an ordinary understanding of what constitutes an "emergency."[12]

### b. Agency Intent at the Time of Promulgation

There is a paucity of historical information concerning the agency's drafting and adoption of 40 C.F.R. § 1506.11, which has never been amended from its original text. In an attempt to fill this gap, Plaintiffs have proffered the declaration of Nicolas C. Yost, who served as CEQ's general counsel from 1977 until 1981 and was the

---

**11.** The Navy itself makes much of the fact that it commenced the process for preparation of an EIS for the "SOCAL Range Complex" as early as December of 2006. *See* 71 Fed.Reg. 76639 (December 21, 2006). As the decision to prepare an EIS necessarily involved a determination that the Navy's preplanned training activities might have a "significant environmental impact," the Navy should/could have consulted with CEQ about the need for "alternative emergency arrangements" at that juncture (and avoided this litigation altogether). Counsel conceded this point at oral argument, noting that, while the

Navy could have sought alternative arrangements earlier, it elected to "proceed cautiously."

**12.** At least one scholar has found fault with the *Crosby* decision to the extent that it affords deference to CEQ's findings in an area (economic planning and development) outside of its expertise. *See* Orsi, *supra* note 9, at 506–507 (suggesting that "no court should accord substantial deference to CEQ's decisions on whether an emergency has occurred, unless the circumstances bringing about the emergency are environmental in nature.").

"principal draftsperson" of the regulations. Mr. Yost explains that "[w]ithin the Council at the time of the adoption of the Regulations what we conceived of as an 'emergency' was something characterized by the severity of its impact and by its unexpected and imminent occurrence—for instance, a dam that was failing, with the potential for immediate harm to both people and property." (Yost Decl. ¶ 5.) He further explains that he "would not consider the holding of a planned set of maneuvers or an unfavorable judicial ruling an 'emergency' within the meaning of 40 C.F.R. § 1506.11." (*Id.* at ¶ 7.)

The Navy maintains that Mr. Yost's personal opinions cannot be considered at this juncture and, in any case, are entitled to no weight. The Court agrees, in that Mr. Yost's statements, coming some 30 years after the regulation was promulgated, are an "unreliable guide" to the agency's intent, akin to oft-criticized "subsequent legislative history." *See Chapman v. United States*, 500 U.S. 453, 464 n. 4, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (citing *Pierce v. Underwood*, 487 U.S. 552, 566–567, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *Quern v. Mandley*, 436 U.S. 725, 736, n. 10, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978)); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) ("[S]ubsequent legislative history is a 'hazardous basis for inferring the intent of an earlier Congress.'") (quoting *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960)).

Even absent consideration of the Yost declaration, the limited "regulatory history" supports a narrow, rather than a broad

interpretation of the phrase "emergency circumstances." The initial, proposed version of 40 C.F.R. § 1506.11 required the agency "*proposing* to take" the emergency action(s) to consult with CEQ regarding alternative arrangements. *See* 43 Fed. Reg. 25243 (June 9, 1978) (emphasis added). However, in adopting the final regulation, the drafters changed "proposing to take" to "taking," to eliminate any inference that consultation must necessarily precede agency action. They explained the need for this change as follows:

> Several commenters expressed concern that the use of the phrase "proposing to take the action" would be interpreted to mean that agencies consult with the Council before emergency action was taken. In the view of these commenters, *such a requirement might be impractical in emergency circumstances and could defeat the purpose of the section.* The Council concurs and substituted the phrase "taking the action." Similarly, the Council amended the section to provide for consultation "as soon as feasible" and not necessarily before emergency action.

Implementation of Procedural Provisions; Final Regulations, 43 Fed.Reg. 55988 (Nov. 29, 1978) (emphases added). This explanation clearly reflects that, at the time of the regulation's drafting, CEQ apprehended the phrase "emergency circumstances" to refer to sudden, unanticipated events, not the unfavorable consequences of protracted litigation. CEQ's contrary interpretation in this case is "plainly erroneous and inconsistent" with the regulation and, concomitantly, not entitled to deference.[13]

---

**13.** Plaintiffs also argue that CEQ's interpretation and findings are entitled little or no deference because they arise out of an informal, quasi-judicial proceeding, as opposed to formal rulemaking. *See, e.g., Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). However, because this case involves an agency's informal interpretation of its own *regulations*, rather than the *statute* it administers, *Skidmore* is inapplicable. *See, e.g., Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir.2006) ("Under *Skidmore*, an agency's interpretation of a statute that is not reached

### 2. Additional Principles of Statutory Construction Preclude a Broad Reading of "Emergency Circumstances"

As explained above, the CEQ and Navy's interpretation of the phrase "emergency circumstances" to include the readily anticipated consequences of this Court's issuance of injunctive relief is contrary to both the plain meaning of the language utilized and the drafters' original intent, to the extent that said intent may be discerned from the limited regulatory record. For the reasons discussed directly below, the application of additional canons of statutory construction further confirms that 40 C.F.R. § 1506.11 is inapplicable to the facts of this case, due to the lack of any *bona fide* "emergency."

### a. The CEQ and Navy's Broad Interpretation is Contrary to NEPA and Produces Undesirable Outcomes

■ As Plaintiffs point out, it is well established that NEPA contains no "national security" or "defense" exception. *See, e.g., San Luis Obispo Mothers for Peace v. NRC,* 449 F.3d 1016, 1035 (9th Cir.2006) ("There is no 'national defense' exception to NEPA .... The Navy, just like any federal agency, must carry out its NEPA mandate to the fullest extent possible and this mandate includes weighing the environmental costs of the [project] even though the project has serious security implications.") (internal quotations and citations omitted) (alteration in original). Nevertheless, the CEQ's broad "emergency" determination in this case purports to create precisely such an exemption. (*See* CEQ letter at 4 ("Therefore, there are urgent national security reasons for providing alternative arrangements under the CEQ regulations.")) [14]

It is axiomatic that there exists a presumption against reading an exemption into a statute where Congress has not authorized one. The fact that Congress has created specific exemptions to NEPA (for military training and otherwise) in the past strongly informs the Court's reluctance to read the regulation so broadly as to independently authorize CEQ to do the same, in the absence of a legitimate "emergency." *See, e.g.,* Nat. Def. Auth. Act, Pub.L. No. 106–398 § 317, 114 Stat. 1654, 1654A–57 (2000) ("Nothing in the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.) or the regulations implementing such law shall require the Secretary of Defense or the Secretary of a military department to prepare a programmatic, nation-wide environmental impact statement for low-level flight training as a precondition to the use by the Armed

---

through the normal notice-and-comment procedure does not have the force of law and is not entitled to *Chevron* deference. But where an agency interprets its own regulation, even if through an informal process, its interpretation ... is controlling ... unless plainly erroneous or inconsistent with the regulation.") (internal quotation marks and citations omitted).

14. The Navy insists that 40 C.F.R. § 1506.11 affords an "alternative" to rather than an "exemption" from NEPA compliance. However, this distinction is largely academic, as 40 C.F.R. § 1506.11 clearly operates to exempt agencies from the usual rigors involved in the preparation of an EIS, which forms the "heart" of NEPA. *See, e.g., Envtl. Def. Fund, Inc. v. Andrus,* 619 F.2d 1368, 1374–75 (10th Cir.1980) ("At the heart of NEPA is § 102(2)(C) and its mandate that, under specified circumstances, federal agencies must prepare an Environmental Impact Statement."); *Sierra Club v. Adams,* 578 F.2d 389, 392–93 (D.C.Cir.1978) ("Section 102(2)(C) of the statute, 42 U.S.C. § 4332(2)(C) (1970), which requires a 'detailed statement' of the environmental impacts of, and alternatives to, various federal actions, has been aptly described as 'the heart of NEPA ....'") (citation omitted).

Forces of an airspace for the performance of low-level training flights."); Arizona–Idaho Conservation Act, Pub.L. No. 100–696, § 607, 102 Stat. 4571, 4599 (1988) (providing that "the requirements of section 102(2)(c) of the National Environmental Policy Act of 1969 shall be deemed to have been satisfied" in connection with specific construction on site for Mount Graham international observatory.) [15] Indeed, in other cases—cited by the Navy—in which Courts absolved agencies of their NEPA obligations, the agencies were faced with conflicting Congressional mandates. *See, e.g., Gulf Oil Corp. v. Simon,* 502 F.2d 1154, 1157 (Temp.Emer.Ct.App.1974) (agency action in response to "a determination by Congress in the Emergency Petroleum Allocation Act that immediate emergency action was necessary to avoid foreseen catastrophic nationwide consequences of a critical shortage of crude oil"); *Atlanta Gas Light Co. v. Fed. Power Com.,* 476 F.2d 142, 150 (5th Cir.1973) (NEPA compliance not required where direct conflict existed with agency's other statutory duties under the Natural Gas Act); *Dry Color Mfrs.' Ass'n. v. Dep't of Labor,* 486 F.2d 98, 108 (3d Cir.1973) (NEPA exemption "justified by the need to accommodate the provisions of NEPA with those of the Occupational Safety and Health Act.")

Moreover, as Plaintiffs repeatedly point out, reading 40 C.F.R. § 1506.11 to permit CEQ to grant broad-sweeping exceptions to the EIS process for routine agency activity in the absence of Congressional authorization directly conflicts with and subverts NEPA's directive that agencies comply with their NEPA duties "to the fullest extent possible." *See* 42 U.S.C. § 4332; *see also* 40 C.F.R. § 1500.6 ("The phrase 'to the fullest extent possible' in

section 102 means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible."). Courts have consistently afforded this directive an expansive interpretation to exclude from compliance only those situations in which it is truly unachievable. *See Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,* 426 U.S. 776, 787, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976) ("NEPA's instruction that all federal agencies comply with the impact statement requirement—and with all the other requirements of § 102—'to the fullest extent possible,' 42 U.S.C. § 4332, is neither accidental nor hyperbolic."); *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n,* 449 F.2d 1109, 1114 (D.C.Cir.1971) ("We must stress as forcefully as possible that this language does not provide an escape hatch for footdragging agencies; it does not make NEPA's procedural requirements somehow 'discretionary.' "). CEQ and the Navy's expansive reading of 40 C.F.R. § 1506.11 is therefore *ultra vires* to NEPA.

Such a reading also produces the absurd result of permitting agencies to avoid their NEPA obligations by re-characterizing ordinary, planned activities as "emergencies" in the interests of national security, economic stability, or other long-term policy goals. *See, e.g., Ariz. State Bd. for Charter Sch. v. U.S. Dep't of Educ.,* 464 F.3d 1003, 1008 (9th Cir.2006) ("[W]ell-accepted rules of statutory construction caution us that 'statutory interpretations which would produce absurd results are to be avoided.' ") (quoting *Ma v. Ashcroft,* 361 F.3d 553, 558 (9th Cir.2004)); *Silvers v. Sony Pictures Entm't, Inc.,* 402 F.3d 881, 900

---

**15.** Of course, the Court does not mean to suggest that unforeseen events (such as foreign invasion or escalation of hostilities) implicating national security cannot be "emergencies" under 40 C.F.R. § 1506.11.

(9th Cir.2005) ("A ... consideration in statutory interpretation is practicality, or put another way, the avoidance of an absurd result.") (citation omitted).[16] Assuming arguendo that CEQ approves the requested alternative arrangements in such circumstances, as it has here, what was conceived as a narrow regulatory exception to the EIS preparation requirements would swallow those requirements whole. This cannot be consistent with Congressional intent.

### b. The CEQ and Navy's Broad Interpretation Raises Serious Constitutional Questions

Via its January 15, 2008 letter, CEQ purports, in the Navy's own language, to issue "prospective alternative arrangements for compliance with NEPA," given "the emergency circumstances posed by the Navy's need to conduct its MFA sonar training in light of the Court's injunction ...." (Reply at 21.) As discussed above, these "alternative arrangements" encompass, *inter alia,* a series of mitigation measures that were duly considered and rejected as inadequate by this Court. *See supra* page 1221.

██ To this end, there is a serious question as to whether CEQ, an executive body, is sitting in review of a decision of the judicial branch (and, in effect, crafting its own, alternative injunction). As discussed in section II.B.2, *infra,* activity of this nature raises serious constitutional concerns under the Separation of Powers doctrine. Nonetheless, this Court must endeavor to avoid a finding of unconstitutionality. *Meinhold v. U.S. Dep't of Def.,* 34 F.3d 1469, 1476 (9th Cir.1994) ("When the constitutional validity of a statute or regulation is called into question, it is a cardinal rule that courts must first determine whether a construction is possible by which the constitutional problem may be avoided.") (citing *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 582 & n. 22, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979)); *see also Ma,* 257 F.3d at 1106 ("The Supreme Court has long held that courts should interpret statutes in a manner that avoids deciding substantial constitutional questions.") (citing *DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)) (additional citations omitted).

In affording 40 C.F.R. § 1506.11 a narrow interpretation, the Court may avoid addressing the question of whether the agency's action is constitutional. The Court concludes that CEQ's application of the regulation to this case was improper in the first instance and that the Navy remains subject to the traditional NEPA requirements which the Court considered at length in its August 2007 and January 2008 orders granting preliminary injunctive relief.

## II. The Coastal Zone Management Act (CZMA)

### A. Statutory Presidential Exemption Provision

The CZMA provision on which the President's exemption relies reads:

After any final judgment, decree, or order of any Federal court that is appealable under section 1291 or 1292 of title 28, United States Code ... that a specific Federal agency activity is not in compliance with [the approved state management program], and certification by

---

**16.** By means of example, Plaintiffs posit that CEQ "could declare an 'emergency' to expedite timber leasing on the theory that the cut is necessary to eliminate future fire hazards; or to expedite oil and gas leasing in protected preserves on the theory that additional energy production is a national 'emergency.'" (NRDC Opp'n at 14.)

the Secretary [of Commerce] that mediation under subsection (h) is not likely to result in such compliance, the President may ... exempt from compliance those elements of the Federal agency activity that are found by the Federal court to be inconsistent with an approved State program, if the President determines that the activity is in the paramount interest of the United States....

16 U.S.C. § 1456(c)(1)(B). From its plain language, the provision allows the President to exempt certain aspects of federal agency activities from compliance with the California Coastal Management Plan (CCMP) if doing so is in the "paramount interest" of the country, *but only after* a court first determines that the activities at issue fail to comply with the plan.[17] Thus, the President's power to exempt does not spring into being *until* a federal court has weighed the question of whether an agency activity meets the standard of the CCMP, and concluded that it does not.[18]

The Navy argues that the President has followed the letter of the law. The Court

agrees. The Court's injunction is an interlocutory order appealable pursuant to 28 U.S.C § 1292(a)(2). The President's Memorandum granting the exemption specifically states that the Secretary of Commerce "certified that mediation under section 1456(h) is not likely to result in the Navy's compliance with section 1456(c)(1)(A)." The President then found that COMPTUEX and JTFEX are in the "paramount interest" of the United States. Accordingly, the President's exemption complies with 16 U.S.C. § 1456(c)(1)(B).

## B. Constitutionality of the Presidential Exemption Provision As Applied

Plaintiffs argue that the application of the statute in this case is unconstitutional. They contend that the President "simply disagreed with this Court's determination that the modified preliminary injunction would protect national security interests while also minimizing harm to marine mammals." (CCC Opp'n at 5.) Since the grounds for President's exemption are the

---

**17.** A number of environmental laws contain presidential exemption provisions. None of these provisions, however, include the requirement that the President must wait until after a district court has found an agency not to be complying with the law before issuing the exemption. *E.g.*, the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1323 ("The President may exempt any effluent source of any department, agency, or instrumentality in the executive branch from compliance with any such a requirement if he determines it to be in the paramount interest of the United States to do so."); the Clean Air Act (CAA), 42 U.S.C. § 7418(b) ("The President may exempt any emission source of any department, agency, or instrumentality in the executive branch from compliance with such a requirement if he determines it to be in the paramount interest of the United States to do so .... The President shall report each January to the Congress all exemptions from the requirements of this section ... together with his reason for granting each such exemption."). See also similar provisions in the

Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6961(a); the Safe Water Drinking Act, 42 U.S.C. § 300h–7; the Noise Control Act, 42 U.S.C. § 4903(b); and the Power Plant and Industrial Fuel Act of 1978, 42 U.S.C. § 8373.

**18.** The provision does not compel any action by the court, to whose final judgment, decree, or appealable order the President's exemption responds. Instead, the federal agency whose activities are ruled improper under the state management plan can seek from the President an exemption from the parts of the law with which it has been found not to comply. The finding of noncompliance stands, but the court's remedy is vitiated by the presidential exemption. This requirement that the President must wait until a court renders a decision raises the question whether the provision, on its face, unconstitutionally requires district courts to render non-binding advisory opinions. Because Plaintiffs attack the statute as applied, however, the Court need not consider its facial constitutionality.

same as the grounds for the Court's injunction, the exemption "reviews and overturns an order of an Article III Court." (*Id.* at 6.) The Navy counters that the President's exemption expressly accepts the Court's finding of noncompliance with the CZMA. The President's Memorandum exempting the Navy's exercises does not state that the Court's finding was wrong, the Navy argues, but rather effectively changes the underlying law by determining that compliance is not possible given the President's assessment of the nation's "paramount interests."

The Navy argues that the President's exemption is not subject to challenge because the President is not an "agency" within the meaning of the Administrative Procedure Act. (Defs.' Reply at 9.) The Court agrees that the President is not an agency. U.S. Const., art. II, § 1. Nevertheless, the President's action is subject to review for its constitutionality. *Franklin v. Massachusetts,* 505 U.S. 788, 801, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). The Court likewise agrees that it may not review the President's determination of what is or is not "in the paramount interests of the United States." *Kasza v. Browner,* 133 F.3d 1159, 1173–74 (9th Cir.1998) (finding that under RCRA, Congress explicitly left the determination of "the paramount interest" to the President). Rather, the Court undertakes here to decide whether it is required to vacate its injunction *because* of the President's exemption, not whether the President's determination of the paramount interest was justified.

### 1. Article III Limits on Executive Revision of Judicial Decisions

■ It is axiomatic that the decision of an Article III court is subject to the review only of a higher court. *Hayburn's Case,* 2 U.S. 408, 2 Dall. 409, 1 L.Ed. 436 (1792), has long stood "for the principle that Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch." *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 218, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (Scalia, J.). At issue in *Hayburn's Case* was the Invalid Pensioners' Act of 1792, which called upon Article III judges to review the pension applications of disabled Revolutionary War veterans. The judges were to submit qualified veterans' names to the Secretary of War. The Secretary of War would then place the qualified veterans on the pensioners' list, unless he suspected "imposition or mistake," in which case the veteran would not be placed on the list. Richard H. Fallon, Daniel J. Meltzer & David L. Shapiro, *Hart & Wechsler's The Federal Courts and The Federal System* 91 (5th ed.2003). The judges refused this commission, reasoning that the statute allowed executive revisions of judicial decisions, an unconstitutional encroachment on the judicial power vested in the courts by Article III. It was reasoned that "by the Constitution, neither the Secretary of War, nor any other Executive officer, nor even the Legislature, are authorized to sit as a court of errors on the judicial acts or opinions of this court." *Hayburn's Case* at 410.

■ Although the political branches may neither review the decisions of the courts, nor direct the results of pending cases, *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872), Congress may change or amend the underlying law, even if this would change the outcome in pending litigation. *Plaut,* 514 U.S. at 214, 115 S.Ct. 1447; *see also Stop H–3 Ass'n v. Dole,* 870 F.2d 1419, 1432 (9th Cir.1989) (citing *Friends of the Earth v. Weinberger,* 562 F.Supp. 265, 270 (D.D.C.1983) ("Through the passage of legislation which governs the lawsuit, Congress can effectively moot a controversy notwithstanding its pendency before the courts.")). In *Plaut,* the Supreme Court held that a statute requiring the courts to reopen *final* judgments in civil lawsuits violated the

separation of powers. Justice Scalia explained,

> The record of history shows that the Framers crafted this charter of the judicial department [Article III] with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to decide them, subject to review only by superior courts in the Article III hierarchy—with an understanding, in short, that 'a judgment conclusively resolves the case' because 'a "judicial Power" is one to render dispositive judgments.'

514 U.S. at 218–19, 115 S.Ct. 1447 (citing Frank Easterbrook, *Presidential Review*, 40 Case W. Res. L.Rev. 905, 926 (1990)). Later, in *Miller v. French*, Justice O'Connor explained that "[p]rospective relief under a continuing, executory decree remains subject to alteration due to changes in the underlying law." 530 U.S. 327, 344, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000). As prospective relief requires "continuing supervisory jurisdiction by the court," such relief "may be altered according to subsequent changes in the law." *Id.* at 347, 120 S.Ct. 2246.

### 2. Whether the President's Actions Constitute Executive Revision

■ The question before the Court, then, is whether the President's exemption in this case amounts to an executive revision of a judicial decision. The Court must ask: Did the President's exemption effectively change or amend the underlying law, or does it either direct the result or constitute a review of the Court's decision in this case? If the former, there would be no constitutional problem. If the latter, however, the exemption violates Article III by encroaching on the judicial power. As Congress has no power to direct the result in an ongoing case, nor to review a decision of an Article III court, it cannot delegate such power to the President. *See Plaut*, 514 U.S. at 219, 115 S.Ct. 1447.

The Navy directs the Court's attention to a number of cases which it claims have "firmly held" that statutes authorizing, and presidential actions pursuant to, presidential exemption provisions do not raise Article III concerns. The Court strongly disagrees with this characterization of existing case law. None of the cases cited by the Navy consider the constitutional question. For example, the Navy points to *Weinberger v. Romero–Barcelo*, which discusses the presidential exemption provision of the Federal Water Pollution Control Act (FWPCA). 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The issue in *Romero–Barcelo* was whether the district court had the discretion to issue any lesser remedy than injunctive relief where the Navy had failed to timely obtain permits for the discharge of materials into the waters around the Puerto Rican island of Viecques. The Supreme Court noted that the exercise of such discretion would not contradict, but instead complement, the presidential exemption provision in the statute: "We read the FWPCA as permitting the exercise of a court's equitable discretion ... to order relief that will achieve compliance with the Act. The [presidential] exemption serves a different and complementary purpose, that of permitting noncompliance by federal agencies in *extraordinary circumstances*." *Id.* at 319, 102 S.Ct. 1798 (emphasis added).

This case is distinguishable. The President had not issued an exemption in *Romero–Barcelo*; thus the constitutionality of such an exemption was not before the Court. Rather, the Supreme Court was deciding the proper scope of the district court's discretion under the FWPCA. Responding to arguments that this interpretation of the FWPCA would contradict the standards laid out in the act itself, particularly the presidential exemption, the Supreme Court explained, "Reading the statute to permit the exercise of a court's

equitable discretion in no way eliminates the role of the exemption provision in the statutory scheme." *Id.* The district court could formulate relief to ensure compliance with the FWPCA; if "extraordinary circumstances" subsequently arose, the President had the power, "believing paramount national interests so require, to authorize discharges which the District Court has enjoined." *Id.*

In *Kasza v. Browner,* the district court found that the Environmental Protection Agency (EPA) had violated the public disclosure requirements of Resource Conservation and Recovery Act (RCRA) with respect to hazardous waste disposal on a military base. 133 F.3d 1159, 1173. The President, concluding that the relevant documents were classified, exempted them from disclosure under RCRA § 6001(a).[19] *Id.* The district court then declared the matter moot. *Id.* On appeal, the plaintiff did not raise a constitutional question. Instead, the plaintiff made the limited argument that the statute allowed the President to exempt an agency from specific statutory provisions, not to exempt certain documents based on their classified status. The Ninth Circuit disagreed, noting that the language stated the President could exempt an agency from compliance with any RCRA "requirement." [20] *Id.*

Here, two aspects of the President's exemption render it constitutionally suspect. First is the timing. This Court originally issued an injunction halting the Navy's training exercises in August 2007. The Court's August 2007 Order was an appealable order; thus, under the terms of 16 U.S.C. § 1456(c)(1)(B), the President *could have acted at that time* to exempt the Navy's training exercises. The Navy apparently did not seek an exemption at that time, instead seeking relief from the Ninth Circuit. It was only after the case was remanded to this Court, and this Court issued its modified injunction and refused the Navy's request for a stay, that the Navy sought an exemption. At oral argument, the Navy explained that it did not need to seek a presidential exemption sooner, because it has heretofore been able to continue its training unaltered and unfettered by this Court's rulings. This strikes the Court as the inter-branch equivalent of forum shopping: So long as the Navy could manage to continue unobstructed, it would consent to appear before this Court and before the Ninth Circuit. Only once the Navy found it could no longer avoid this Court's injunction did it seek more favorable review from the President.[21] Clearly, this exemption does not

19. The President declared: "I hereby exempt the Air Force's operating location near Groom Lake, Nevada from any ... provision respecting control and abatement of solid waste or hazardous waste disposal that would require the disclosure of classified information ... to any unauthorized person." *Id.*

20. The other cases to which the Navy cites do not address the question of the constitutionality of either a statutory provision authorizing a presidential exemption or a specific application of such an exemption. *See Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976) (mentioning presidential exemption as part of the CAA's statutory scheme); *California v. Dep't of the Navy,* 624 F.2d 885, 887 n. 2, 889 (mentioning the avail-

ability of an exemption in the CAA and noting that the Navy had not sought one); *Natural Res. Def. Council v. Watkins,* 954 F.2d 974 (4th Cir.1992) (noting that, if national security concerns arose, the Department of Energy could seek a presidential exemption from the requirements of the CWA to allow effluent discharge from a nuclear reactor).

21. Again, this Court and the Ninth Circuit have expended considerable judicial resources in the five months since the first injunction was issued. Given that no new "extraordinary circumstances" appear to have arisen, seeking the presidential exemption in August 2007 would have saved the courts considerable time and effort. *See supra* note 11.

*change* the underlying law. Rather, the exemption appears to strip the Court of its ability to provide effective relief.

Second is the absence of any considerations other than those already weighed by the Court. The President's Memorandum makes it fairly clear that there are no "extraordinary circumstances" (as contemplated in the *Romero–Barcelo* dictum) arising after the Court's injunction was issued; instead, the President appears to have re-weighed the equities, and come to a different conclusion. The President's exemption, therefore, renders the Court's opinion advisory. If the Court had sided with the Navy and approved the Navy's mitigation plan in its entirety, then it appears that the President would have acquiesced to its ruling. The Navy's plan would have been bolstered by receiving a judicial stamp of approval. Here, however, the Court accepted only some of the Navy's measures, and imposed others the Navy finds burdensome. In response, the President deemed compliance impossible. This leads the Court to the conclusion that its jurisdiction over this case has been illusory: the Court never really had the power to "conclusively resolve the case," as the judicial power requires.

■ Courts generally defer to the Executive Branch in matters of national security, particularly where the matter in question is "a sensitive and inherently discretionary judgment call [and] is committed by law to the appropriate agency of the Executive Branch." *Dep't of the Navy v. Egan,* 484 U.S. 518, 527, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (deferring to military's decision not to grant security clearance to openly gay woman). *See also Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953) (stating that the Army's decision not to award commission to, or alternatively to discharge, a medical specialist is not reviewable). This deference is an acknowledgment of the distinct roles of the Judicial Branch and the Executive Branch in our constitutional system of government.

This deference must be tempered, however, by "[t]he established principle of every free people ... that the law shall alone govern; and to it the military must always yield." *Dow v. Johnson,* 100 U.S. 158, 169, 25 L.Ed. 632 (1880) (Field, J.). Deference therefore does not mean a court must abjure judicial review whenever a party raises the specter of national security.[22] Absent judicial review, there would be no independent means of ensuring the continuing vitality of the bedrock "doctrine that the military should always be kept in subjection to the laws of the country to which it belongs." *Id.* Accordingly, throughout the course of this litigation, the Court has deferred to the Navy's representations of the interests of national security, while avoiding using deference to create a judicial exemption from the nation's environmental laws.

## III. The Court Need Not Decide the Constitutional Question

■ Notwithstanding its concerns about the constitutionality of the President's exemption in this case, the Court

---

**22.** In *Laird v. Tatum,* for example, the Supreme Court held that a suit by civilians seeking redress for the chilling effect of the Army's intelligence gathering program did not present a justiciable controversy because of the absence of a specific present or specific future harm. 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). This holding notwithstanding, the Court explained that it had not abandoned its "traditional insistence on limitations on military operations in peacetime.... [T]here is nothing in our Nation's history or in this Court's decided cases ... that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied." *Id.* at 15–16, 92 S.Ct. 2318.

need not decide that issue in order to uphold the injunction. *See supra* Section (I)(B)(2)(b) (discussing the doctrine of constitutional avoidance). The Court is satisfied that its injunction stands firmly on NEPA grounds. A federal agency may comply with NEPA by completing an EIS, or by issuing an EA supporting a Finding of No Significant Impact (FONSI). Alternatively, an agency may avoid the requirement to prepare an EIS by adopting mitigation measures sufficient to eliminate any substantial questions over the potential for significant impact on the environment. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733–34 (9th Cir.2001) ("In evaluating the sufficiency of mitigation measures, we consider whether they constitute an adequate buffer against the negative impacts that may result from the authorized activity. Specifically, we examine whether the mitigation measures will render such impacts so minor as to not warrant an EIS."). Here, the Navy has not completed an EIS; the Court found its EA and FONSI to be inadequate. The mitigation measures issued on January 3, 2008, as modified January 10, 2008, are necessary to eliminate substantial questions about environmental impacts of the Navy's exercises. Unless it implements these mitigation measures, the Navy may not continue with its training exercises.

## IV. A Stay Pending Appeal Remains Unwarranted

When considering whether to issue a stay pending appeal, the district court must consider the following factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Artukovic v. Rison*, 784 F.2d 1354, 1355 (9th Cir.1986); Fed. R.Civ.P. 62(c). Alternatively, the court may grant a stay if the party seeking the stay "demonstrates ... that serious questions are raised and the balance of hardships tips sharply in his favor." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1158 (9th Cir.2006).

Here, the Court has concluded that the injunction stands firmly on NEPA grounds. The Navy has failed to demonstrate that it is likely to succeed on the merits on appeal. In addition, as the Court noted in its January 14, 2008 Order Denying Defendant's Motion for Stay Pending appeal, "the imposition of these mitigation measures will require the Navy to alter and adapt the way it conducts antisubmarine warfare training-a substantial challenge. Nevertheless, evidence presented to the Court reflects that the Navy has employed mitigation measures in the past, without sacrificing training objectives. *See, e.g.*, Jan. 3, 2008 Order at 9 and evidence cited therein." There is no evidence that, absent a stay, the Navy will suffer *irreparable* injury. Accordingly, this factor weighs against the imposition of a stay.

By contrast, if the Court were to issue a stay, the harm to Plaintiffs would be substantial. The Navy has already completed six training exercises and will complete eight more in the next eleven months. It is likely that the exercises at issue could be completed, rendering moot months of litigation. Having prevailed twice before this Court, and once before the Ninth Circuit, Plaintiffs would nonetheless obtain no remedy.

Finally, there are two aspects to public interest in this case: the public interest in having a well trained Navy for the purpose of national defense and the public interest in the protection and maintenance of coast-

al resources, particularly marine mammals. If the Court were to grant the stay sought by Defendants, the training exercises at issue in this suit would go forward at the expense of coastal resources. By leaving the injunction in place, the Navy may continue with its training exercises, while limiting negative effects on marine life. Accordingly, the Court is satisfied that the public interest weighs against the issuance of a stay.

For the same reasons, the Court cannot conclude that Defendants have raised "serious questions" and that the balance of hardships tips sharply in their favor. The Court's decision here rests on narrow statutory grounds; the constitutional issue, which does raise substantial questions, was avoided. Furthermore, the Navy may continue with its training exercises while its appeal is pending. The Court therefore does not conclude that the balance of hardships tips sharply in Defendants' favor. Accordingly, Defendant's request for a stay pending appeal is DENIED.

## CONCLUSION

The Navy's Ex Parte Application, docket no. 131, is denied in its entirety. The temporary partial stay, docket no. 133, is lifted.